**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James L. KINGTON and Don Earney,
Defendants–Appellants.**

No. 88–1408.

United States Court of Appeals,
Fifth Circuit.

June 9, 1989.

Rehearing Denied July 14, 1989.*

---

* Opinion on rehearing, 878 F.2d 815.

Ben L. Krage, Kasmir & Krage, Dallas, Tex., for Kington.

Emmett Colvin, David W. Coody, Dallas, Tex., for Don Earney.

J. Michale Worley, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before ALDISERT,* REAVLEY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James L. Kington and Don Earney appeal from convictions for misapplying bank funds, making false entries in bank records, causing a bank to fail to file a Currency Transaction Report, and, in Kington's case, filing a false tax return. Kington and Earney contend that the jury instructions on the misapplication counts incorrectly stated the specific intent element of the crime; that there was insufficient evidence to support conviction on any count; and that they were not tried within the time limits prescribed by the Speedy Trial Act. We reverse the conviction of both defendants on three counts because we find insufficient evidence to support the verdict. We reverse Earney's conviction on one other count, also for reason of insufficient evidence. We affirm the remaining convictions.

I

This case is now before the Circuit for the third time. *See United States v. Kington*, 801 F.2d 733 (5th Cir.1986) (reversing district court's order, which had declared certain evidence inadmissible); *United States v. Kington*, 835 F.2d 106 (5th Cir. 1988) (rejecting defendants' claims that retrial subjected them to double jeopardy).

James L. Kington was Vice President of the Abilene National Bank. Don Earney was President of the same bank. Kington and Earney both sat from time to time on the bank's Loan and Discount Committee, which approved loans for submission to the Board of Directors. During the periods covered by the indictment, Kington had no personal loan authority, and could act only with Earney's approval. Between 1980 and 1982, Kington became actively involved in arranging sales and purchases of the

---

* Circuit Judge of the Third Circuit, sitting by designation.

bank's stock. According to the government, Kington took commissions, apparently without the knowledge of the buyers or the bank. Some of this money made its way to Earney.

The first set of transactions took place between January 1980 and March 1981. During that period, Kington would find a seller and a purchaser for bank stock. Kington would buy the stock himself, and would arrange for a loan from the bank to the purchaser covering the entire purchase price of the stock. The proceeds of that loan would go to Kington, who would then deliver the stock to the purchaser. The loan application forms did not disclose Kington's interest in the transaction. Kington apparently made over $90,000 during this first period. The government contended at trial that in October 1980, Kington paid Earney $18,000 from the proceeds of one particular set of transactions.

The second set of transactions commenced in March 1981. After that date, Kington would not himself purchase the stock. Instead, he would find a buyer and a seller, and then arrange for the buyer to finance the entire purchase with a loan from the bank. According to the government, Kington would quote one price to the buyer, and a lower price to the seller. He would directly remove the loan proceeds from the bank, and deposit most of the proceeds to the seller's account (or buy a check payable to the seller). Kington would, however, keep some money for himself. According to the government, Kington did not fill out appropriate reporting forms. He also did not report the money on his personal income tax return, and did not disclose to the bank his personal interest in the loans which he helped to arrange.

Finally, there was one multi-party transaction with a particularly large pay-off. This transaction began in October 1981. One of the bank's "control group" shareholders—a group of shareholders who had reciprocal agreements with Earney for the use of their stock—wished to sell, and told Earney so. Earney approached a rich oil man, Cloyce Talbot, and asked him to buy the shares temporarily. Earney guaran-

teed Talbot against losses, and told Talbot that he could keep any profit upon sale of the stock. By December 1982, Kington had found twelve buyers. The buyers each had to assume $\frac{1}{12}$ of Talbot's purchase-money debt, plus make a cash payment of $66,667 for each block of 10,000 shares. Ten of the buyers borrowed the full cash payment from Abilene National; Kington submitted the loans to the discount committee and recommended approval. The loan applications did not reveal that the proceeds were to be used to buy stock in the bank itself, or that Kington and Earney were involved in the sale arrangement. Kington and Earney eventually received from Talbot checks in the amount of $347,-893.28. Talbot, Kington, and Earney contend that these checks were low-interest loans which Talbot issued because he was grateful to Kington and Earney for including him in so profitable a venture. The government contends that the checks were essentially a pay-off on a complicated embezzlement scheme.

The multi-party Talbot transaction was the basis for Count 49 of the indictment, which was dismissed by the district court after the jury verdict because of a variance between the date of the transaction and the date alleged in the indictment. The Talbot transaction nonetheless forms the predicate for Counts 50–52. Those counts, which charged Earney with causing the bank to fail to file CTR's, were not infected by the variance in Count 49. The jury convicted Earney on all three counts, and the district court did not disturb those findings.

Talbot was involved in one additional count of the indictment. Talbot deposited money to the bank under the fictitious name of "Frank Nito." The government contends that there were false entries, and a failure to meet reporting requirements, in connection with that deposit.

Kington and Earney were indicted pursuant to 18 U.S.C. § 656 (criminalizing embezzlement by officers and directors of FDIC-regulated banks, and other national banks); 18 U.S.C. § 1005 (criminalizing false reporting and recordkeeping by officers and directors of banks); 31 U.S.C. §§ 1059 and

1081 (1982) (later recodified as 31 U.S.C. §§ 5322 and 5313, respectively) (criminalizing conduct which causes a bank to fail to file Currency Transaction Reports); 18 U.S.C. § 2 (general accessory liability); and, in Kington's case, 26 U.S.C. § 7206 (filing a false income tax return). The indictment originally contained fifty-three counts, but eighteen were eventually dismissed. Kington and Earney were found guilty on the remaining thirty-five counts.

## II

■ The government and the defendants agree that the government must establish four elements in order to obtain a conviction under 18 U.S.C. § 656. First, the government must show that the accused was an officer, director, agent or employee of a bank. Second, the government must show that the bank was in some way connected with a nationally or federally insured bank. Third, the government must show that the accused willfully misapplied the monies or funds of the bank. Fourth, the government must show that the accused acted with the intent to injure or defraud the bank. The defendants' first point of error goes to the fourth and final of these elements.

The defendants challenge the court's instruction to the jury with respect to the *mens rea* for a § 656 violation. The court's instruction was as follows:

"Intent to injure or defraud" means to act with the specific intent to deceive or cheat, ordinarily for the purpose of gaining some financial benefit or causing a financial loss to someone else. "Intent to injure or defraud" exists if the defendant acts knowingly and if the natural consequences of his conduct is or may be to injure the bank. However, it is not necessary that actual injury to the bank be shown because the essence of the offense is willfull conduct depriving the bank of the use of its funds and the right to decide how its funds are to be used. And the Government is not required to prove that the loans or transactions in question were bad loans or transactions, and it is not material whether the loans

were later repaid—or not repaid—to the bank.

The defendants aim their fire at the second sentence in this passage. They contend that the sentence effectively creates a mandatory presumption that equates "intent to injure or defraud" with "knowing action that has a natural tendency to injure." If such a presumption were created, the instruction would inappropriately dilute the mental state required for conviction. It would then be necessary to vacate the defendants' conviction. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

Specific intent is generally hard to define and hard to prove. Not surprisingly, appeals in § 656 cases frequently involve challenges to the instructions or evidence regarding specific intent. *See, e.g., United States v. Adamson,* 700 F.2d 953 (5th Cir. 1983) (Unit B en banc), *cert. denied,* 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983); *United States v. Cauble,* 706 F.2d 1322 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. Brock,* 833 F.2d 519 (5th Cir.1987). It is equally unsurprising that much of the jury argument in this case centered upon the specific intent element. The prosecutor argued to the jury as follows:

Intent to injure or defraud. You know we can't cut open the defendants' head and say "Ah-ha, there is the intent to injure or defraud." So what do you look at; what do you look at to determine whether or not there was intent to injure or defraud? We look to see what he did; we see what the effect of what he did is.

... Intent to injure or defraud. This means to gain—The Court tells you, ordinarily, for the purpose of gaining some finance that will benefit or causing a financial loss to someone else. I don't have to show you that Mr. Kington intended that this bank stock would become worthless; strictly that Mr. Kington intended to gain some financial benefit.

Trial Trans. at 920–21. Counsel for Earney, on the other hand, told the jury,

The Court's charge tells you that to establish specific intent, the defendant must knowingly do an act which the law forbids. He has got to know it. He has got to do it voluntarily and intentionaly [sic]. To do an act which the law forbids, with the intent to violate the law. And I submit to you, ladies and gentlemen, there is nothing in here that shows any specific intent to violate the law.

 ... Is it reasonable, at all, to believe that a man who can put his life in that institution, would do something deliberately, with the specific intent to damage his bank? There is no reason, no scope of reason, to find anything that Don Earney would do specifically pointed at injuring that bank. It is just not there.

Trial Trans. at 957–58. Likewise, counsel for Kington argued to the jury,

 Now, accompanied with these counts are a set of instructions that you are to follow in order to find the defendants guilty. And that is that when Mr. Kington went to the loan committee and presented the loan, he had to intend to cheat and defraud the bank, to injure it, with the specific intent to violate the law.

 I suggest to you that there is not even an assumption that can be drawn from the evidence that that was his intent. Apparently the Government would prohibit bank officers from making profit on the sale of bank stock. And maybe they shouldn't. I don't know. I don't sit in judgment of those things. But that is not what these gentlemen are charged with.

Trial Trans. at 967. On rebuttal, the prosecutor concluded his argument with the following contention:

 Ladies and gentlemen, I ask that you look at the facts in this case, and that you determine under the law and the evidence that the defendants were dealing unfairly with the bank; that they were dealing unfairly with the board of directors and with the regulators, and people appointed to examine the records of the bank; and that they were doing so in order to line their own pockets—put money into their own pockets. And that,

according to the language, is intent to injure or defraud.

Trial Trans. at 987–88. The defendants preserved an objection to the charge itself, but all of the quoted arguments, from both sides, passed without objection or judicial comment.

 Our decision in *United States v. Adamson*, 700 F.2d 953 (5th Cir.1983) (Unit B en banc) discussed extensively the *mens rea* for a § 656 violation. We concluded that in "order to convict a defendant for willfully misapplying funds with intent to injure or defraud a bank, the government must prove that the defendant *knowingly* participated in a deceptive or fraudulent transaction." 700 F.2d at 965. On the basis of this conclusion, we overruled a line of cases which permitted a conviction on the basis of recklessness rather than knowledge. We said, "The trier of fact may infer the required intent, *i.e.*, knowledge, from the defendant's reckless disregard of the interest of the bank; however, jury instructions should not equate recklessness with intent to injure or defraud." 700 F.2d at 965.

 The *Adamson* court went on to reverse, on *Sandstrom* grounds, a conviction returned by a jury which had been instructed that "a reckless disregard of the interest of the bank is the equivalent of intent to injure or defraud the bank." 700 F.2d at 965. There is, of course, no hint of a recklessness standard in the charge now before us. Even in the passage challenged by Kington and Earney, the court quite clearly says that the defendants must act knowingly. The question is instead whether the contested instruction tells the jury that the defendants need only know that they are selling stock, rather than that they are participating in a fraud.

 This difference is important. The *Sandstrom* challenge advanced by Kington and Earney rests ultimately in an ambiguity: the referent of the word "knowingly" is unclear. The situation was much different in *Adamson*. The charge in that case explicitly and unequivocally equated recklessness with the required intent. The problem did not arise because of ambiguity.

Nonetheless, there can be little doubt that it is undesirable for a trial judge to instruct the jury that "intent to injure or defraud *exists* if the defendant acts knowingly and if the natural consequences of his conduct is or may be to injure the bank." Several circuits have criticized this formulation of § 656's specific intent requirement, and have said that, if taken alone and out of context, such an instruction misstates the intent requirement. *United States v. Unruh,* 855 F.2d 1363 (9th Cir. 1987), *cert. denied,* — U.S. —, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988); *United States v. Cooper,* 577 F.2d 1079 (6th Cir.1978), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978); *United States v. Arthur,* 544 F.2d 730 (4th Cir.1976). Under the rule that emerges from these decisions, the defective instruction would constitute reversible error if uncorrected by the remainder of the charge.

■ We agree that a trial court errs by instructing a jury that intent to injure or defraud *exists* if the defendant acts knowingly and if the natural consequences of this action are to injure the bank. Certainly intent to injure or defraud may be inferred from the combination of knowing action and natural consequences. But there is a possibility that the jury may be misled if told that the requisite intent *exists* if the combination of knowledge and natural consequences is present. If taken out of context, the statement may appear to mean that the defendant need only know that he is voluntarily engaging in transactions for his own benefit, rather than, as *Adamson* requires, that the defendant knew he was participating in a deceptive or fraudulent transaction.

The government wrongly contends that we endorsed in *Cauble* a jury instruction of the form contested here. We did say in that case that "[i]ntent in a § 656 case is 'basically for the jury.' It exists if the defendant acts knowingly and the natural result of his conduct is or may be to injure the bank; there is no requirement that the accused desire the injury." 706 F.2d at 1355. Yet we made these observations in response to a sufficiency of the evidence

argument. The question before us at that point was what sort of evidence would permit the jury to infer the relevant intent. Later on the same page of the *Cauble* opinion, we answered Cauble's challenge to the jury charge. We pointed out that the *Cauble* charge avoided the defect of the *Adamson* charge. Moreover, the *Cauble* charge also avoids the defect complained of by Kington and Earney, for in *Cauble* the trial judge carefully informed the jury that the defendants acted knowingly only if they were "aware that [their] conduct is reasonably certain to cause the result." 706 F.2d at 1355 n. 138. The instruction thus made clear that the specific intent element required awareness of the result—the injury to or fraud upon the bank—rather than merely awareness of the act.

■ Nonetheless, the presence of an imprecise or misleading statement within the jury instruction does not by itself entitle defendants to a reversal. Reversible error exists only if the jury charge, considered as a whole, misled the jury as to the elements of the offense. *Adamson,* 700 F.2d at 965. Indeed, four judges dissented in *Adamson* on the ground that the jury instruction at issue there was not misleading when judged as a whole. 700 F.2d at 968.

At this point in our analysis, the distinction between the ambiguity in the charge now before us and the express error in the charge before the *Adamson* court becomes crucial. The *Adamson* majority found it decisive that the improper charges were presented in the alternative to the proper charges. The majority explained, "the proper charges were not simply inconsistent with the improper charges; rather the improper charges were made *in addition to* or *the equivalent of* the proper charges. In one instance, the jury instruction expressly states that recklessness is an *additional* meaning." 700 F.2d at 966.

■ No similar defect exists in the charge challenged by Kington and Earney. The imprecise "knowledge plus natural consequences" formula is preceded by a sentence telling the jury that " '[i]ntent to injure or defraud' means to act with the specific intent to deceive or cheat, ordinari-

ly for the purpose of gaining some financial benefit or causing a financial loss to someone else." If "knowingly" is interpreted favorably to the defendants, these two sentences may be completely consistent. The charge does not suggest that the second sentence presents an alternative or additional definition to supplement the first sentence's definition. As such, the charge in this case is comparable to the charge in the Sixth Circuit's *Cooper* case, which that Court found acceptable when judged as a whole, 577 F.2d at 1083, rather than the *Adamson* charge, which was held to constitute reversible error.

Indeed, the charge in *Cooper* very closely resembles the one challenged here. The Sixth Circuit agreed that the jury instruction was imprecise insofar as it instructed the jury that "[a]n intent to injure or defraud a bank exists if a person acts knowingly, and if the actual result of his conduct would be to injure or defraud the bank *even though this may not have been his motive.*" 577 F.2d at 1082 (emphasis supplied by the Sixth Circuit). The court concluded, however, that this defect was not so prejudicial as to require reversal, for the instruction contained other passages which alleviated the problems caused by the imprecise sentence. The *Cooper* court pointed in particular to the following passage:

> To act with intent to defraud means to act wilfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to ones (sic) self. However, the evidence in the case need not establish that the bank was actually defrauded, but only that the accused conspirator act with intent to defraud.

577 F.2d at 1083. This passage obviously resembles the first sentence in the district court's charge in this case. We see no material distinction between the charge found acceptable in *Cooper* and the charge now before us.

There are additional reasons why the charge in this case, unlike the one disapproved by the *Adamson* court, survives appellate scrutiny. In the *Adamson*

charge, the trial court treated § 656 as a three element crime, with the "intent to injure and defraud" element forming a part of a broader "willful misapplication" element. 700 F.2d at 969–70 (appendix quoting the trial charge). By contrast, the trial court here identified § 656 as a four element crime, with "willful misapplication" and "intent to injure or defraud" forming separate elements. The trial court further defined each of these two elements to include a specific intent requirement. The charge defined "willfully" to mean that "the act was committed voluntarily and purposely, with the specific intent to violate the law." The charge immediately thereafter defined "specific intent" to mean "more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids with the intent to violate the law." The court later defined "misapply" to mean that "a bank employee willfully converted money or assets of the bank to his own use and benefit, or to the use and benefit of another, whether or not such money or assets had been entrusted to his care, and that he did this with intent to defraud the bank." The misapplication element thus defined was separable and additional to the distinct "intent to injure or defraud" element. In light of these multiple references to the necessary intent, we do not believe that the single objectionable use of the word "knowingly" was prejudicial to the defendants.

The closing arguments of all the attorneys confirm our conclusions. The prosecutor asked the jury to infer specific intent from the acts performed, and said that Kington and Earney need not in fact have harmed the bank, but the prosecutor never contended that the defendants need not have known that they were cheating or defrauding the bank. The defense attorneys both zeroed in on the requirement that the jury find a blameworthy intent to hurt the bank. The jury argument would have been no different had a precisely accurate charge been used. We do not believe the jury was misled.

Although we find that the charge supplies no ground for reversal, we do believe that a clearer charge would be preferable in these cases. The difficulties of defining specific intent are notorious, and its importance is obvious. The problems raised by the charge in this case might be avoided by using a charge modeled upon available pattern instructions. *See e.g.,* Eleventh Circuit Pattern Jury Instructions: Criminal Cases 90–91 (1985).

### III

Kington and Earney contend that, on each and every count of the indictment, the government failed to present evidence sufficient to sustain their convictions. When a challenge is made to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the government, and with all reasonable inferences and credibility choices drawn in support of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We will affirm if any "rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The government's case rested largely upon circumstantial evidence. The standard of review on sufficiency of the evidence questions is the same whether the evidence is direct or circumstantial. *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954). We will consider the individual counts separately, since the government must produce evidence linking the defendant in each count to the particular facts alleged in that count. Nonetheless, we note that where, as here, the government presents circumstantial evidence of an ongoing pattern of similar transactions, the jury may reasonably infer from the pattern itself that evidence otherwise susceptible of innocent interpretation is plausibly explained only as part of the pattern.

### A. The § 656 Misapplication Counts

We have already summarized the elements which the government must establish to prove a violation of 18 U.S.C. § 656. The government must show first that the accused was an officer, director, agent, or employee of a bank; second, that the bank was in some way connected with a nationally or federally insured bank; third, that the accused willfully misapplied the monies or funds of the bank; and fourth, that the accused acted with the intent to injure or defraud the bank. *United States v. Farrell,* 609 F.2d 816, 818 (5th Cir.1980). Neither Kington nor Earney questions the sufficiency of the evidence on the first two elements. They do, however, contest the sufficiency of the evidence with respect to the third element of the misapplication counts. For analysis, we divide those counts into three groups: the "stock sale" counts, the "missing cash" counts, and one "mixed" count.

#### 1. The "Stock Sale" Counts: Counts 13, 20, 23, 25, 27, 43 and 45

■ In each of these counts the government alleged that Kington, and in some counts Earney, had arranged financing through the bank for persons who used the proceeds to purchase bank stock from Kington, that Kington and Earney made a profit from these transactions, and that Kington and Earney had not disclosed to the bank their interest in the loans. If the government presented evidence to prove up this theory, that evidence would permit the jury to infer both a willful misapplication and an intent to defraud the bank. The jury could conclude that Kington and Earney intended to deceive the bank in order to profit from loans that the bank would not have made if it were aware of the loans' true purpose and the personal interests of the bank officers, and that Kington and Earney knew their activity to be fraudulent.

Kington conceded at trial that he sold the stock as alleged, and that he made a profit. Kington and Earney also concede that the loan proceeds were used to pay Kington for the stock. They contend, however, that

there was nonetheless no evidence of a willful misapplication or of an intent to injure or defraud. They argue both that the government failed to offer any proof eliminating the possibility that Kington and Earney disclosed orally Kington's interests in the loans, and that there was no misapplication of bank funds because there is nothing unlawful about selling stock for a profit.

### a. The New Loan Counts: Counts 13, 20, 43, and 45

For counts 13, 20, 43, and 45, the government introduced into evidence loan applications, each of which had been submitted, and recommended for approval, by loan officer Kington, or by Kington together with Earney. In none of these applications was it disclosed that the loan was for the purchase of stock in the bank itself, or that Kington was the seller of the stock. To show that the bank considered such information relevant to its approval of the loans, the government introduced other applications, pertaining to other loans, which did disclose that the loans were to be used to purchase bank stock. The government presented testimony from a bank director, who said that his decision upon the loans would have been affected had he known that Kington or Earney had an interest in the proposed loan. The government also elicited testimony about the transactions from the stock purchasers, introduced into evidence the stock records of the bank, introduced into evidence tax returns and other financial records showing payments made to and by Kington, and showed payments made to Earney.

Kington and Earney contend that these convictions cannot stand, for the government presented no evidence to negate the possibility that Kington or Earney might have orally informed the bank's loan and discount committee about Kington's interest. Witnesses testified that loan officers or committee members sometimes added orally to the information presented in the written loan application. No witness could recall Kington or Earney making a relevant disclosure, but no witness could recall everything that was said at the committee meetings.

The evidence showed that the bank was doing a very high volume of business at the time the crimes allegedly occurred, and that the loan and discount committee would meet several times a week for periods of several hours. No detailed records of oral comments were kept. Under these circumstances, it is hardly surprising that no witness could remember everything said at the meetings, or that witnesses could not recall the particular meetings at which particular loans—not remarkable on their face—were approved. It does not follow that the committee members would not have been able to recall admissions by Kington or Earney that they were engaged in self-dealing transactions related to the bank. The jury might reasonably infer from the absence of any such recollection, and from the loan applications making no mention of Kington's interests, that Kington and Earney intended to, and did, hide their interests from the bank.

Alternatively, Kington and Earney contend that there was no proof of the requisite intent to defraud, since Kington intended only to profit from the innocent sale of appreciated stock. The government, however, introduced evidence that there was no well-established market price for the bank's stock, and that the price of the stock depended largely upon the existence of financing for purchases of the stock. See, e.g., Trial Trans. at 153–54, and 306–07. On the government's theory, Kington and Earney were able to create a profitable market for the stock by causing the bank to provide loans for purchases of the stock at prices favorable to Kington. The jury might reasonably have believed this theory to be true beyond a reasonable doubt, and believed that the bank might have been unwilling to approve the loans if it knew their full purpose. The jury could thus have inferred that Kington and Earney intended to deceive the bank for their own profit, since that would be the natural consequence of the defendants' knowing acts. The jury might have drawn further support for its conclusion from the evi-

dence of various payments made by Kington to Earney, payments which might have compensated Earney for the profits Kington reaped by exploitation of the bank's market-making capacity.

### b. The Credit Line Counts: Counts 23, 25, and 27

Three of the stock sale counts differ from those just discussed. In Counts 23, 25, and 27, the loans used to purchase the stock were renewals of existing lines of credit. Kington and Earney contend that because the stock purchasers had existing lines of credit with the bank and because those credit lines had been renewed before the stock sales were first discussed, Kington and Earney did not cause the bank to approve the loans, or did not do so with the requisite intent. Kington and Earney cannot be guilty of a misapplication in connection with a loan unless they "made, or influenced in a significant way, as an officer of the bank, the decision to extend the loan." *United States v. McCright*, 821 F.2d 226, 230 (5th Cir.1987).

The trial testimony of Harry LeMaire, one of the purchasers involved in the line-of-credit counts, indicated that the lines of credit were renewed by the bank before the borrowers developed any intention to purchase bank stock, from Kington or anybody else. Trial Trans. at 191–92. The government appears to concede that the lines of credit were renewed before the borrowers decided to use those lines to purchase bank stock. The government contends, however, that Kington and Earney are nonetheless guilty of a misapplication. In particular, the government contends that the lines of credit were not intended to be used for the purchase of stock, that Kington caused the actual cashier's checks to issue upon the lines of credit, and that neither Kington nor Earney informed the bank of their conflict of interest. The ministerial act of issuing checks will not, however, suffice to constitute a misapplication of bank funds. There is no evidence to suggest that the line-of-credit borrowers would have been unable to invoke their lines absent interested intervention by Kington. Nor does the development of a conflict of interest after the loan was approved matter from the standpoint of § 656.

We therefore reverse the convictions on Counts 23, 25, and 27 because we find insufficient evidence to support the jury's verdict.

### 2. The "Missing Cash" Counts: Counts 15, 17, 18, and 36

In Counts 15, 17, 18, and 36, the government alleged that Kington had skimmed cash out of stock transactions without ever himself selling any stock. The evidence for these counts tended to show that Kington interested a potential purchaser in buying bank stock; that Kington helped the prospective purchaser to secure a loan from the bank for the purchase of the stock, but that the loan application did not disclose the loan's connection with the purchase of bank stock or Kington's interest in the loan; and that there was a discrepancy between the loan amount and the purchase price of the stock. The evidence further tended to show that Kington was personally involved in the transfer of the loan proceeds to the seller's account, and that there was an unexplained "cash out" indication in the bank's records equal to the discrepancy between the amount of the loan and the price of the stock. There was, moreover, testimony that the purchasers of the stock had no idea that there was a discrepancy between the stock price and the amount of the loan. *See* Trial Trans. at 212–14. The jury could easily have concluded that the only plausible explanation for the discrepancies between the loan amount and the stock prices was that Kington was skimming cash out of the transactions.

Kington and Earney contend, however, that there is insufficient evidence to support the jury's verdict because the government did not prove that any cash ended up in Kington's hands. Certainly the government would prefer to have direct rather than circumstantial evidence of Kington's misapplication of funds. But the possibility of better evidence does not im-

ply that the extant evidence is insufficient. The unexplained "cash-outs" in the bank records, taken in isolation from the government's other evidence, might have been innocently explained: as the defendants correctly contend, it might have been possible that the cash never even left the bank. Yet the evidence was not presented in isolation. The unexplained cash-outs were presented in combination with unexplained discrepancies between the prices of stock and the amounts of loans. It was also presented in combination with evidence, conceded in part by Kington, that Kington and Earney were engaged in a continuing pattern of profit-making activity involving loans to acquire bank stock. The jury could reasonably determine that a willful misapplication, with the requisite intent to injure or defraud the bank, was the only plausible explanation for the evidence.

### 3. The "Mixed" Count: Count 30

■ Count 30 involved a mixture of the "stock sale" and "missing cash" theories. The government contended that a bank loan had been arranged to finance a purchase by Max Williams of some stock from Kington and some stock from B.D. Click, a third party, and that, in addition to receiving the proceeds from his own stock sale, Kington skimmed cash out of the purchase from Click. In only one respect does the evidence on this count differ from the evidence already discussed: although the government sought to show that Click received only $132,000, leaving missing cash in the amount of $18,000, Click himself testified that he had sold 6,000 shares at $25 each, leaving no missing cash. The jury was, however, free to disbelieve Click's testimony, and to accept the discrepancy suggested by the government's evidence. We find sufficient evidence to sustain the convictions on Count 30.

### 4. The "Aiding and Abetting" Convictions: Counts 23, 25, 27, 30 and 36

Kington was convicted of aiding and abetting Earney with respect to the crimes alleged in counts 23, 25, 27. We have already found the evidence insufficient to

sustain the misapplication alleged in those counts, and accordingly must reverse the aiding and abetting convictions as well.

■ Earney contends with respect to Count 30 that he had no relationship to the crime charged against Kington, except that he was present at the loan and discount committee meeting when the loan was approved. The jury, however, had before it evidence of an ongoing scheme through which Kington and Earney profited through the covert use of bank loans to finance purchase of bank stock. The jury might reasonably have inferred that the only plausible explanation for Earney's behavior was that he withheld objections to and informations about Kington's unlawful loans in order to reap the benefits of the continuing scheme. As such, Earney helped Kington to perpetrate the willful misapplication, and did so with the intent to injure or defraud the bank. There is no lack of evidence to support Earney's conviction on Count 30.

Nor is there any problem with Earney's aiding and abetting conviction on Count 36. The reasons applicable to Count 30 are equally good here. In addition, the government showed that Earney had, at the time of the transaction described in Count 36, received an unexplained check approximately equal to half the amount which, according to the government's theory, Kington had skimmed out of the stock sale. The jury could plausibly have concluded from the coincidence of dates and amounts that the check was a pay-off for Earney's participation in the ongoing fraud.

### B. The § 1005 False Entry Counts: Counts 14, 16, 19, 31, 37, 41, 44, and 46

Counts 14, 16, 19, 31, 37, 41, 44 and 46 charged the defendants with making false entries in violation of 18 U.S.C. § 1005. Counts 14, 16, 44, and 46 named only Kington as a defendant. Count 41 named only Earney as a defendant. Counts 19, 31, and 37 named Kington as the principal and Earney as an aider and abettor.

In order to prove that the defendant made a false entry in violation of § 1005, the government must show (1) that the entry is false; (2) that the defendant either made the entry or caused it to be made; (3) that the defendant knew the entry was false when he made it; and (4) that the defendant intended that the entry injure or deceive the bank officers or public officers. *United States v. Jackson,* 621 F.2d 216, 219 (5th Cir.1980).

### 1. The Companion Counts to the Misapplication Counts

#### a. Kington as principal

Counts 14, 16, 19, 31, 37, 44 and 46 are companion counts to Counts 13, 15, 18, 30, 36, 43, and 45, respectively. Each of these companion counts alleges a violation of 18 U.S.C. § 1005, and names Kington as the principal in the crime. The government contended, and the jury apparently found, that the entries by Kington on the loan application forms were false because they omitted to mention Kington's interest in the loans. "The omission of material information as well as an actual misstatement qualifies as a false entry under the statute." *United States v. Jackson,* 621 F.2d at 219.

For the most part, Kington's arguments on these counts only repeat the arguments we have rejected above in connection with the companion misapplication counts. However, Kington makes one distinct argument: he contends there was, in essence, a variance between the indictment and the proof submitted with respect to the "stock sale" companion counts. The indictment alleged that the "loan proceeds would be and were used in part to buy stock" and that the balance was used by Kington "as a bribe, kickback, and commission." Kington contends that he received all of the proceeds of the loan from the sale of his stock, and that none of this amount was a bribe, kickback, or commission. We see no reason, however, why a bribe, kickback or commission cannot take the form of a premium upon the price of stock sold by a bank officer. The jury had sufficient evidence to conclude that Kington received a kickback of precisely this form. We therefore need not decide whether the alleged variance, were it to exist, would be fatal to the convictions. *See United States v. McGuire,* 744 F.2d 1197, 1203 (6th Cir. 1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985).

#### b. Earney as aider and abettor

Earney is named as an accessory to Kington in Counts 19, 31, and 37. Earney contends that there was no evidence whatsoever linking him to the transaction charged in Count 19, and that he was not even present at the loan and discount committee meeting when the loan in question was approved. Earney was not charged in Count 18, the companion to Count 19. The government did not make any response to Earney's argument on this point. Having found no evidence to link Earney to the crime charged in Count 19, we reverse his conviction for aiding and abetting on that count.

We have already, in the course of discussing Counts 30 and 36, discussed Earney's connection to the transactions involved in Counts 31 and 37. There is sufficient evidence linking him to those transactions, and we affirm his conviction on those two counts.

### 2. The "Frank Nito" Transaction: Count 41

Earney alone was named in Count 41, which dealt with a Certificate of Deposit issued under the assumed name "Frank Nito" for Cloyce Talbot, a wealthy oilman who participated in one of the stock sale transactions. The social security number on the certificate differed from Talbot's in two digits, which were transposed in Talbot's own number. Earney essentially concedes that he established the certificate at Talbot's request. Earney contends, however, that there was no evidence of an intent to injure or defraud the bank by the false entry. Talbot testified that the account was created under a false name for "personal reasons," and that neither he nor Earney had any bad purpose in connection with the account.

The existence of intent to injure or defraud is in general a question for the jury. The jury could have disbelieved Talbot's explanation of the transaction. The jury could, moreover, have inferred from the admitted falsehood that Talbot and Earney were trying to hide something from the bank that the bank should have known, and that they had a bad purpose for the falsehood. There is sufficient evidence to support the conviction on Count 41.

### C. The CTR Counts: Counts 29, 32–35, 38–40, 42, 47–48, and 50–52

The jury convicted the defendants for failing to file Currency Transaction Reports (CTR's) in connection with several transactions. *See* 31 U.S.C. §§ 1059 and 1081 (later recodified as 31 U.S.C. §§ 5322 and 5313, respectively). In order to obtain a conviction for the violations charged, the government had to establish that the defendants willfully caused the bank to fail to file a Currency Transaction Report for a payment of currency in excess of $10,000, and that the defendants did so in connection with the violation of other federal laws.

### 1. The Companion Counts to the Misapplication and Frank Nito Counts

Most of the CTR counts arise out of cash payments allegedly made in connection with misapplication transactions already discussed. One of the counts arises out of the Frank Nito transaction. In all of these cases, we have already found sufficient evidence to support the jury's apparent endorsement of the government's theory of events. We therefore consider only the additional issues raised by the CTR charges.

Kington and Earney contend that the government failed to show that the defendants knew they had to file CTR's. We find, however, that there was sufficient evidence to permit the jury to conclude that Kington and Earney did know of the reporting requirements. With respect to Kington, the evidence included his secretary's description of a conversation she had with Kington about whether a CTR had to be filed in connection with a particular transaction. Trial Trans. at 874. With respect to Earney, Gerald Snodie, who had been executive vice-president of the bank, testified that he believed that Earney knew of the requirements. Trial Trans. at 687. Nearly all of the bank employees who testified, including secretaries, appeared to be aware of the CTR requirements. The jury could reasonably find that the only plausible explanation of the evidence was that both Kington and Earney were aware of the CTR requirements.

Kington and Earney next contend that because the government did not show the defendants to have ordered anybody not to file a CTR, the government could not have proven that the defendants caused the bank not to file a CTR. This argument, too, fails. Kington and Earney need not have ordered anybody else not to file a transaction. They need only have conducted transactions in a way that would purposely defeat the reporting requirements. They could either have conducted the transactions by themselves, or they could have disguised the character of the transactions so that their co-workers would overlook the need to file a CTR. The jury could infer from the absence of any filing, together with Kington's and Earney's interests in hiding their illicit dealings, that Kington and Earney caused the bank not to file a CTR in connection with the transaction.

Finally, Kington and Earney contend that the government failed to prove that the required CTR's were not filed. Kington and Earney contend that the government produced evidence showing only that no CTR's were filed in Utah, and that the government could not prevail without also showing that no CTR's were filed in Austin, Texas. The testimony indicated, however, that all CTR's should have been forwarded to, and filed in, Odgen, Utah. Trial Trans. at 702–05. Lyndell Rogers testified that he, after investigating the bank's records, caused the bank to file some belated CTR's, which he believed were not duplicates of CTR's earlier filed, in connection with the transactions identi-

fied by the government. Trial Trans. at 387–88 and at, e.g. 456. The jury could reasonably conclude that the only plausible explanation of the evidence was that no CTR's were filed.

### 2. The Talbot Transaction Counts: Counts 50–52

Three of the CTR counts, naming only Earney as a defendant, were companions to Count 49, which the trial court dismissed after trial for insufficiency of the evidence. Count 49 had alleged a multi-purchaser transaction financed in part through Cloyce Talbot, and as a consequence of which both Kington and Earney received more than $300,000 apiece from Talbot. Talbot testified, and the defendants maintain, that the payments to Kington and Earney were simply low-interest loans which Talbot made, not to pay-off Kington and Earney for any illicit activities, but out of gratitude to them for having included him in a successful business venture.

Count 49 was apparently dismissed because of a variance between the date of the transaction alleged in the indictment and the date proven at trial. The variance was apparently the result of a clerical mistake, and did not affect the companion CTR counts. Earney does not contend that the eventual dismissal of Count 49 requires the dismissal of Counts 50–52.

 In addition to arguments that we have already rejected in connection with other counts, Earney contends that there was insufficient evidence to show that he had violated the law as charged in Count 49. The government had to prove that the non-filings alleged in Counts 50–52 took place in connection with the violation of another federal law. The jury was, however, free to disbelieve Talbot's account of the transaction. The jury might reasonably have concluded that, in light of the large payment to Earney and the pattern of dealing suggested by the government's evidence, the only plausible explanation of the evidence was the government's theory: that Kington and Earney had devised a large and successful scheme to use Talbot to deceive the bank and secure its funds

for their personal benefit. We find the evidence sufficient to sustain the conviction.

### D. The Tax Count: Count 53

Kington contends that there was insufficient evidence to convict him for filing a fraudulent income tax return, 26 U.S.C. § 7206(1). Kington's argument on this count is, however, entirely derivative from his argument on the "missing cash" counts already discussed. Having rejected that argument earlier, we need not address it again now. There is sufficient evidence to sustain the jury's verdict against Kington on the Tax Count.

### E. Summary

We reverse for insufficiency of the evidence the convictions of Earney for his alleged role as the principal in Counts 23, 25, and 27. We likewise reverse for insufficiency of the evidence the convictions of Kington for his alleged role as aider and abettor in Counts 23, 25, and 27, and the conviction of Earney for his alleged role as an aider and abettor in Count 19. All remaining convictions are supported by sufficient evidence.

### IV

The remaining convictions of Kington and Earney will stand unless vitiated by the alleged Speedy Trial Act violation. In order to analyze the Speedy Trial Act arguments, we must examine in some detail the chronology of the criminal proceedings against Kington and Earney. The crucial dates are as follows:

(1) 2/29/85: Kington and Earney arrested.

(2) 3/5/85: Kington and Earney arraigned; both defendants make an oral waiver of their rights under the Speedy Trial Act.

(3) 3/11/85: Earney files a written waiver of his rights under the Speedy Trial Act.

(4) 3/15/85: Kington files a written waiver of his rights under the Speedy Trial Act.

(5) 10/21/85: Jury empanelled for trial of Kington and Earney.

(6) 10/23/85: Suppression motion by Kington and Earney granted; jury dismissed and mistrial declared in order to enable the government to appeal the evidentiary ruling immediately.

(7) 11/15/85: Written suppression order issued.

(8) 11/22/85: Government notices its appeal.

(9) 11/24/86: Fifth Circuit issues its mandate, reversing the suppression order and remanding.

(10) 12/2/86: Mandate filed with the district court.

(11) 12/17/86: Case transferred from docket of Judge Woodward to docket of Judge Buchmeyer.

(12) 2/3/87: Kington and Earney file various motions.

(13) 5/1/87: Defendants' motion to dismiss on double jeopardy grounds is denied.

(14) 5/8/87: Defendants notice an interlocutory appeal.

(15) 1/29/88: Fifth Circuit issues mandate affirming the district court's denial of the motion to dismiss.

(16) 3/11/88: Defendants motion to dismiss on Speedy Trial Act grounds.

(17) 4/5/88: Trial begins. The courts denies defendants' motions filed on Feb. 3, 1987, and also denies the Speedy Trial Act motion.

■ As a general matter, the Speedy Trial Act requires that a defendant be tried within 70 days of his arraignment. The Act also allows the clock to be stopped or reset as a result of various events in the pre-trial process. In general, the clock will stop when motions are pending before the trial judge, or during an appeal. When the clock stops for such a proceeding, all days between and including the commencement and termination of the proceeding are excluded from the seventy-day count. The clock will reset to zero if "the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial" or if "the defendant is to be tried again following an appeal or a collateral attack." When the clock resets to zero, "the trial [must] commence within seventy days from the date the action occasioning retrial becomes final." 18 U.S.C. § 3161(e). If the case is not tried within the time limits specified by the Act, the case must be dismissed if the defendant moves for dismissal before trial. 18 U.S.C. § 3162(a)(2). Dismissal may be either with or without prejudice.

The trial which yielded the convictions of Kington and Earney began more than three years after their arraignment. Obviously, then, the government must rely upon some combination of stoppages, resets, or the defendants' waivers in order to defeat the Speedy Trial Act claims. Judge Buchmeyer, in a thorough opinion, analyzed the chronology of this case and endorsed several sets of possible exclusions which would bring the total number of non-excludable days within the statutory limit.

The written waivers filed by Kington and Earney soon after their arraignment might at first appear to resolve this issue. The waivers were renewed after the 1985 mistrial, and were in no way withdrawn until the defendants sought to assert their Speedy Trial rights in 1988. Yet those Circuits which have considered the issue have held that defendants' rights under the Speedy Trial Act are not waivable. *United States v. Pringle*, 751 F.2d 419, 434–35 (1st Cir.1984) *vacated sub nom United States v. McAfee*, 479 U.S. 805, 107 S.Ct. 49, 93 L.Ed.2d 10 (1986); *United States v. Ray*, 768 F.2d 991, 998 n. 11 (8th Cir.1985); *United States v. Carrasquillo*, 667 F.2d 382, 388–90 (3rd Cir.1982). Because the Speedy Trial Act protects not only the interests of the defendant but also the public's interest in a speedy disposition of criminal cases, the Act permits courts to grant continuances only on the basis of specific, recorded findings. 18 U.S.C. § 3161(h)(8). Both the legislative history of the Speedy Trial Act and the Advisory Committee's guidelines to administration of the Act appear to reflect a policy that might restrict the ability of trial courts to grant effective

continuances in the guise of waivers. *See Guidelines to the Administration of the Speedy Trial Act of 1974, as amended,* 106 F.R.D. 271, 300 (1985); *accord, United States v. Carrasquillo,* 667 F.2d at 389–90.

The *Pringle* court, however, held that although a defendant's rights under the Speedy Trial Act are nonwaivable, delays attributable to the waiver are properly excluded from computation of the pre-trial period. 751 F.2d at 434–35. Judge Buchmeyer endorsed this rule, which rests upon the sensible maxim that defendants ought not to be able to claim relief on the basis of delays which they themselves deliberately caused. Judge Buchmeyer expressly found that all of the delays preceding the Kington and Earney trial were, if not otherwise excludable, caused by the defendants' waivers. Yet causation may not simply be presumed if the *Pringle* rule is to respect § 3161(h)(8)'s restrictions upon permissible continuances. It is not immediately obvious that a delay caused by the defendant's waiver is properly excludable if it would not have been possible for the district judge, absent the waiver, to grant a continuance at the time under § 3161(h)(8). Nor is it immediately obvious that there is sufficient evidence now in the record to support the district court's conclusions that the delays in this case were caused by the defendants' waivers. Were we to approve the *Pringle* rule, and were that rule essential to disposition of the Speedy Trial Act issue, it would be necessary to take up these subsidiary issues, and perhaps to remand for an evidentiary hearing on the cause of the delays.

We find it unnecessary, however, to decide today whether *Pringle* should be the law of this Circuit. We have in the past reserved comment upon what effect, if any, is to be accorded defendants' waivers of their Speedy Trial Act rights, *United States v. Peeples,* 811 F.2d 849, 851 n. 1 (5th Cir.1987), and we again reserve comment today. Even if the waivers filed by Kington and Earney were ineffective, Kington and Earney have not been deprived of their rights under the Speedy Trial Act. The clock-stopping and clock-resetting provisions of 18 U.S.C. § 3161 reduce the number of non-excludable days before trial to less than seventy.

■■■ First, as the district court correctly found, there were two trials in this case: the October 1985 mistrial, and the April 1988 trial that convicted the defendants. Any speedy trial act claim predicated upon days elapsed during the period between arraignment and the mistrial was forfeited by the defendants when they went to trial without making any Speedy Trial Act objection. 18 U.S.C. § 3162(a)(1). Defendants can therefore prevail upon their Speedy Trial argument only by showing that seventy non-excludable days elapsed between their retrial in April and the date when the action occasioning their retrial became final.

Second, as the district court also noted, the Speedy Trial clock does not necessarily start to run from the trial court's declaration of a mistrial, but rather runs from "the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). We must therefore decide what action occasioned the retrial, and when that action became final. There are four possibilities: (1) October 23, 1985, when the mistrial was orally declared and the jury was discharged; (2) November 15, 1985, when the trial judge issued his written suppression order; (3) November 24, 1986, when the Fifth Circuit issued its mandate reversing the suppression order and remanding the case; or (4) December 2, 1986, when the district court docketed the Fifth Circuit's mandate.

■■■ The district court found that it was the disposition of the appeal, rather than the declaration of the mistrial, that occasioned the retrial of Kington and Earney. We agree. Excludable days may result from appeals either pursuant to § 3161(e) (resetting the clock when the defendant is to be tried again following an appeal) or pursuant to § 3161(h)(1)(E) (excluding any delay resulting "from any interlocutory appeal"). Some appeals occasioning a retrial —such as a defendant's successful appeal from a final conviction—are not interlocutory and must obviously be treated under

§ 3161(e). Other appeals, including the second appeal in this case, have no direct connection with an event occasioning a retrial, and so must obviously be treated under § 3161(h)(1)(E). A third group of appeals, including the first appeal in this case, are less easily classified. These appeals follow immediately upon, and are closely connected with, an event occasioning a retrial, but do not appeal from a final disposition of the case. As the Eleventh Circuit recognized in *United States v. Lasteed,* 832 F.2d 1240, 1242 & n. 5 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1578, 99 L.Ed.2d 893 (1988), such cases may be analyzed under either the "mistrial" or the "appeal" clauses in § 3161(e).

Where, as here, the mistrial is declared for the very purpose of permitting the appeal, it is more reasonable to regard disposition of the appeal, rather than declaration of the mistrial, as the event occasioning retrial. There is no doubt when the mistrial is declared that the defendants will be retried, if at all, only following the appeal. *Cf. United States v. Crooks,* 804 F.2d 1441, 1445 (9th Cir.1986) ("The district court's order [setting the defendant's retrial], not the dismissal of the jury, constituted the action occasioning the retrial").

In this Circuit, an appellate disposition occasioning a retrial becomes final on the date when the appellate court issues its mandate. *United States v. Mize,* 820 F.2d 118, 120 (5th Cir.1987). The Speedy Trial clock therefore began to run again on November 24, 1986. We thus need determine only whether more than seventy non-excludable days lapsed between that date and the commencement of the second trial.

Third, and again as the district court noted, on February 3, 1987, defendants filed various motions. These motions remained pending until the trial date. Pending motions will toll the trial clock indefinitely; there is no independent requirement that the delay attributable to the motions be "reasonable." *United States v. Welch,* 810 F.2d 485, 488 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *Henderson v. United States,* 476 U.S. 321, 106 S.Ct. 1871, 1876, 90 L.Ed.2d 299 (1986). All time after February 3, 1987, is therefore properly excluded.

Our considerations thus far permit us to limit the relevant, non-excludable days to the period between November 25, 1986, and February 2, 1987, inclusive. This period includes six days in November (11/25–11/30), all thirty-one days in both December and January, and two days in February (2/1–2/2), for a total of exactly seventy days. There are no other non-excludable days, and the trial was thus timely within the meaning of the Speedy Trial Act. The district court properly denied defendants' motion to dismiss.

We need not now consider, and so express no opinion upon, the government's argument that the transfer on December 12, 1986, was a "transfer proceeding" within the meaning of § 3161(h)(1)(G), and that there was additional delay attributable to that proceeding. If the government were to prevail on this argument, the number of non-excludable days would diminish still further. The government, however, need not rely on this argument, for no more than seventy non-excludable days elapsed in any event.

V

The criminal proceedings against Kington and Earney have been complex and lengthy. As one would expect, those proceedings have generated difficult questions on appeal. Kington and Earney were, however, fairly tried, and the jury's verdict stands, except with respect to those counts which we have found lacking in evidentiary support. The judgment of the district court is reversed with respect to the conviction of Kington in counts 23, 25, and 27, and with respect to the conviction of Earney in counts 19, 23, 25, and 27, but is affirmed in all other respects. The case is remanded for re-sentencing.

AFFIRMED in part, REVERSED in part, and REMANDED.