**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Hoyle McCRIGHT, Jr.,
Defendant-Appellant,**

No. 86–1747.

United States Court of Appeals,
Fifth Circuit.

June 25, 1987.

William Monroe Kerr, Ted M. Kerr, Midland, Tex., for defendant-appellant.

Patty Merkamp Stemler, Dept. of Justice, Washington, D.C., Helen M. Eversberg, U.S. Atty., Sidney Powell, Le Roy Morgan Jahn, James Blankinship, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

Defendant William Hoyle McCright, Jr., appeals from his conviction on four counts, including two counts of misapplication of bank funds under 18 U.S.C. §§ 656 and 1006, and two counts of making false entries on reports of banks under 18 U.S.C. § 1005. McCright was sentenced to consecutive terms of three years imprisonment on each count and was fined $5,000 on each count, for a total sentence of twelve years, and a total fine of $20,000. On appeal, the government concedes that the conviction on count two for misapplication of bank funds under section 1006 should be reversed since that section does not apply to bankers. Accordingly, we reverse McCright's conviction on count two; in addition, we find insufficient evidence to support a conviction on count one for misapplication of bank funds under section 656. However, we affirm McCright's conviction on the remaining two counts, and remand for resentencing.

## I

**Background**

The evidence presented at trial revealed a long and complicated history of self-interested dealing by defendant William Hoyle McCright, Jr., while he was executive vice-president of First National Bank of Midland, Texas ("FNB" or "the Bank") between 1977 and 1982. We summarize only briefly below the several dealings that concern us on this appeal.

### a. CEK

In 1978, Sam Conner and James Eastup joined McCright, a longtime friend, in a partnership they named CEK. The initials referred to Conner, Eastup and McCright, respectively. They decided to use "K" instead of "M" because they did not think "it would be wise" to let it be known that McCright was a partner, even though they owned equal shares in CEK. They opened an account at FNB listing only Conner and Eastup as partners. CEK borrowed substantial amounts from FNB to finance approximately 40 oil ventures and real estate deals, and McCright, in his capacity as an officer of FNB, approved most of the loans. In one instance, CEK used FNB financing to purchase a one-sixth interest in 60 acres of land for $11,000 an acre that they later sold for about $60,000 an acre. The proceeds were deposited in a CEK account at FNB, and later distributed in equal amounts to Conner, to Eastup and to a money market account at Merrill Lynch subsequently transferred to McCright.

### b. Wood & Locker and Myra Robinson

In 1976, Myra Robinson approached the trust department at FNB seeking investment advice from Marshall McCrea, an executive vice-president at the bank. McCright suggested to McCrea that she invest with John Wood whom McCright had known for a number of years. Over the next six years, Robinson invested over $7,000,000 in 35 to 40 oil drilling programs with Wood's company, Wood & Locker. For sending Robinson to him, Wood rewarded McCright with a twenty percent interest in Wood & Locker's twenty-five percent interest in the profits realized from Robinson's investments. McCright never informed McCrea, or anyone at FNB, of his reversionary interest in Robinson's investments.

### c. Midland West Corporation

In 1977, Jerry Mobley, a golf professional, spoke with McCright at FNB about the possibility of building a new country club in Midland. After discussing several potential sites, McCright convinced Mobley to consider developing a tract of land owned by John Wood located near McCright's home. Wood expressed interest in the project, and, together with Mobley, Conner, Eastup, McCright and several other individuals, formed the Midland West Corporation. Although McCright was a shareholder (through CEK) and a member of the

original board of directors for Midland, his name did not appear on the shareholder agreement.

Midland turned to FNB for financing, and subsequently received loans totaling over $6,000,000 for construction and maintenance of the club. At first, the only officer at FNB supporting the loan was McCright, who argued strenuously for its approval, though he did not disclose his personal interest in the proposed transaction. In time, FNB approved the loan; McCright did not cast a vote for or against the decision, but remained silent when the vote was taken.

Midland sought further financing from FNB in July, 1981, then borrowing $1,925,000 in order to buy back the shares of McCright, Conner and Eastup at a cost of $5,000 per share. After the money was channeled through a Merrill Lynch money market account, McCright received $337,730 of this money for his shares of Midland.

### d. The Bedford Ranch

In 1980, McCright purchased a one-sixth interest in the 2,294 acre Bedford ranch owned by the Bohannon family for $1,000,000. Conner, Eastup, H.G. Bedford and Rodney Robinson also bought interests. The Bohannons financed the sale and retained a security interest in the property. A year later, McCright convinced John Wood to buy the ranch at $1,500 per acre, for a total purchase price of $3,442,412.50. Wood arranged to buy the farm through his company, the Pen-Dee Corporation, and obtained financing from FNB in the amount of $998,268.15. McCright appraised the ranch for the bank at a value of $3,000 per acre, but did not inform the bank of his financial interest in the sale.

The sale was arranged in such a way that the Bohannons retained a primary lien on the ranch, and McCright and his partners retained a secondary security interest on the ranch. The bank was third in line with its lien. Wood defaulted after making three payments, and McCright and his partners foreclosed on the property and reacquired title to the ranch. The bank never

collected the unpaid balance of its loan to Wood. In October, 1983, the bank failed, and the unsatisfied note on the ranch was taken over by the FDIC.

### e. The Atkins Prospect

McCright invested in certain oil wells with R.N. Hillin, a regular loan customer of his between 1978 and 1981. In one case, McCright had a 6.25% working interest in Hillin's Atkins Prospect in Pecos County which netted him a profit of $9,533 in 1982. CEK also participated actively in Hillin's projects. McCright never informed the bank of his participation in Hillin's investment activity.

### f. H & M

The final transaction of concern involved two properties James Brock gave to McCright. Over the years McCright approved various loans for Brock's oil and gas investments. In 1973, for example, McCright approved a loan for $41,590.95, and on another occasion, in 1976, McCright approved a loan for $27,582.82. However, in 1980 Brock assigned 100% of his interests in two properties to McCright and his wife, which they accepted under the name H & M. The "H" stood for Hoyle, McCright's middle name, and "M" stood for Modell, his wife's first name. McCright explained to his accountant that these properties were a "gift from a friend."

## II

### The Counts of The Indictment

◼ We emphasize at the outset that McCright's failure to disclose his conflicts of interest to FNB do not necessarily constitute violations of federal law. At trial and before this court, the government has repeatedly confused McCright's ethical shortcomings with the substantive proscriptions of the United States Code. McCright's many violations of the bank's internal operating procedures do not alone create offenses prosecutable in federal court. *See United States v. Clark*, 765 F.2d 297, 303 (2d Cir.1985). We do, of

course, review the sufficiency of the evidence on each count in the light most favorable to the government's case. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### a. Count One: Misapplication of Bank Funds

The first count of the indictment concerned McCright's alleged participation in, and benefit from, the loan made by FNB to Midland West Corporation for development of the Green Tree golf course and country club. The indictment charged that McCright "willfully and knowingly did embezzle, misapply and cause to be misapplied monies and funds of the bank in the approximate sum of $1,925,000." Furthermore, the indictment charged that McCright's "personal financial interest in Midland West Corporation and in this loan was concealed by [McCright] from the board of directors of the bank in violation of the 'Standards of Conduct' of the bank and in violation of Title 18, United States Code Section 656." [1] That McCright's conduct violated the bank's "standards of conduct" we have no doubt; but we find no evidence to support a conviction under 18 U.S.C. § 656.

To establish a violation of section 656 the government must prove four elements:

(1) that the accused was an officer, director, agent or employee of a bank; (2) that the bank was in some way connected with a national or federally insured bank; (3) that the accused willfully misapplied the monies or funds of the bank; and (4) that the accused acted with intent to injure or defraud the bank.

*United States v. Farrell*, 609 F.2d 816, 818 (5th Cir.1980); *see also United States v. Mann*, 517 F.2d 259, 267 (5th Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47

L.Ed.2d 97 (1976). McCright does not dispute the first two elements of this test; he admits to being an officer of the bank at all times relevant to the $1,925,000 loan, and that FNB was a federally insured institution. He does, however, challenge the sufficiency of the government's proof that he willfully misapplied $1,925,000 in bank funds.

McCright contends that he could not be guilty of misapplying the 1981 loan to Midland since he was not the loan officer who approved it. The government argues, however, that McCright had an obligation to inform the bank of his interest in the loan's proceeds, and that his failure to do so led to the granting of the loan. In addition, the government contends that the 1981 loan was an extension of the previous 1977 loan to Midland, for which McCright had argued forcefully without disclosing his conflict of interest, and on which he had neither voted nor abstained when it was before the loan committee.

 Although we do not believe McCright had to be the lending agent in order to misapply bank funds in contravention of section 656, the statute does contemplate some causal connection between the defendant's actions as an officer or director of the bank and the making of the loan. Section 656 does not impose an affirmative duty on bank officers and directors to disclose their personal interest in loans that may be approved by other individuals or departments in the bank. Manifest in the use of the term "misapply" is a requirement that the defendant made, or influenced in a significant way, as an officer of the bank, the decision to extend the loan. *See United States v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985); *United States v. Twiford*, 600 F.2d 1339, 1341–42 (10th

---

1. 18 U.S.C. § 656 provides in pertinent part as follows:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Cir.1979). The government had the burden in this case to prove not only that McCright stood to benefit personally from the loan, but that he authorized, or caused the loan to be authorized, through his position at the bank.

 The 1981 loan to Midland was authorized by Joel Mays, an executive vice-president of FNB. The government produced no evidence at trial showing that McCright participated in, or influenced in any way, Mays' decision to approve the $1,925,000 loan. Significant evidence supports, and McCright admits, that he strongly advocated the first Midland loan in 1977, and that he repeatedly urged the other members of the FNB loan committee to approve it. Yet, the government has not demonstrated any formal link between the 1977 and 1981 loans. The fact that the borrower was the same on both occasions is not enough. We find no causal connection between McCright's 1977 advocacy and his benefitting from the 1981 loan, and therefore no violation of section 656 as regards the latter loan.

### b. Count Three: False Entry in a Bank Questionnaire I

 The third count of the indictment charged that McCright "willfully and knowingly, and with intent to defraud and injure the bank," made a false entry in the February, 1982 "executive officers' and directors' questionnaire" (the "February questionnaire") in violation of 18 U.S.C.

§ 1005.[2] The purpose of the February questionnaire was to gather information for the 1982 proxy statement and to comply with Regulation O. Regulation O was issued pursuant to the Federal Reserve Act, 12 U.S.C. §§ 248(i), 375a, 375b, and 12 U.S.C. § 1817(k), and, in accordance with that Act, set limits and reporting requirements on loans made by banks to their executive officers, directors and principal shareholders.[3] 12 C.F.R. §§ 215.4, 215.7, 215.8. The indictment listed three interests that McCright allegedly was required to disclose, but did not: (1) the 6.25% interest in the Atkins Prospect in Pecos County; (2) the reversionary interest in the investment activity of Myra Robinson; and (3) the one-sixth interest in the collateral securing the FNB loan to Pen-Dee Corporation. If substantiated by sufficient evidence, each of these allegations would individually support a conviction under this count. Therefore, the government must only prove the sufficiency of the evidence on one of its charges to prevail. *United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir.1980); *Myrick v. United States*, 332 F.2d 279, 281 (5th Cir.1963), *cert. denied*, 377 U.S. 952, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). Accordingly, we limit our analysis to the third allegation, since the evidence supports a finding that McCright violated section 1005 by causing a false entry to be made in the bank's records, with intent to injure or defraud the bank, when he failed to disclose his interest in the Bedford ranch.

**2.** 18 U.S.C. § 1005 provides in pertinent part as follows:

> Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**3.** In 1978, Congress amended the Federal Reserve Act by establishing strict guidelines for member banks to follow when lending funds to insiders and their related interests. 12 U.S.C.

§ 375b(5); *see* 12 C.F.R. § 215.1. Section 375b was just one part of a broad-reaching update of the Federal Reserve Act intended to respond to the many changes in the banking industry since the last major reform was made in the 1930s. The need for this legislation became apparent after several major banks failed, partly due to insider abuses, as well as the much publicized past activities of Bert Lance, the Director of the Office of Management and Budget in 1977. The bill's House sponsor announced that this legislation heralded a new day for bank regulation in this country: "It clearly emphasizes that bankers and savings and loan executives are operating with other people's money and that charters for financial institutions are not franchises to establish playpens for insiders." H.R.Rep. No. 1383, 95th Cong., 2d Sess. 200, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9273, 9331.

As an initial matter, McCright argues that his conviction on count three should be set aside because of a variance between the allegation in the indictment and the proof at trial. The indictment charged McCright with failing to report "a ⅙ right to collateral securing a First National Bank of Midland loan in the sum of $2,444,000 to Pen-Dee Corporation." The $2,444,000 figure, he points out, was the amount of the note retained by the sellers of the Bedford ranch, not the amount loaned to Wood's Pen-Dee Corporation. In fact, Wood received $998,268.45 in funds from FNB. The government concedes its error, but asserts that it "was an immaterial variance between a superfluous averment and the proof at trial." The government contends that the variance did not prejudice McCright's defense in any way, since throughout the trial he manifested a clear understanding of the substance of the allegation.

■■■ The existence of a variance between a charge in the indictment and the proof at trial does not require automatic reversal of a conviction. *United States v. Bruno,* 809 F.2d 1097, 1103 (5th Cir.1987). "In order for a variance to warrant reversal, it must affect the substantial rights of the accused." *Id.* (citing *Kotteakos v. United States,* 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946)). A careful reading of the trial transcript convinces us that McCright fully understood the nature of the charge. His counsel's pointed cross-examination of witnesses on this issue unequivocally demonstrates this understanding. *See United States v. Salinas,* 654 F.2d 319, 324 (5th Cir.1981). Indeed, in his briefs to this court McCright does not suggest that he was misled by the careless drafting of the indictment, or that any substantial rights were infringed. He argues simply that the variance alone required reversal. We disagree, and find that no prejudice resulted from the variance between the charge and the proof at trial that would lead us to set aside the jury's verdict.

McCright also challenges his conviction on the third count of the indictment by arguing that the 1982 questionnaire did not require disclosure of his one-sixth interest in the Bedford ranch. The questionnaire asked McCright to respond as follows:

(1) Please list any corporation, partnership, trust, association, joint venture, pool syndicate, sole proprietorship, unincorporated organization or other form of business entity ... of which you ...:

(c) Own, control or have the power to vote 10 percent or more of the total interest in the entity *but* only if you also participate or have the authority .to participate in major policy making functions of the entity or are a director of the entity.

The phrasing of the questionnaire closely resembles that of Regulation O,[4] for which the information was to be used.

■■■ McCright contends that his undivided one-sixth interest in the land did not fall within the purview of the questionnaire or Regulation O. The basis for this assertion is not entirely clear from his briefs, but apparently stems from a belief that landed interests do not constitute a form of business entity. Although some forms of land ownership would not be considered business related, McCright's interest in the Bedford ranch was his participation in a joint business project. In 1980 he and several other individuals bought the ranch, and one year later sold it for a substantial profit. McCright admitted to the FBI agent investigating the case that the pur-

---

4. Regulation O governs extensions of credit by a "member bank ... to any of its executive officers, directors, or principal shareholders or to any related interest of that person." 12 C.F.R. § 215.4(a). A "related interest" is "[a]ny company controlled by" the director or officer. *Id.* § 215.10(a)(2). A person has "control of a company" if he "[o]wns, controls, or has the power to vote 25 percent or more of any class of voting securities of the company." *Id.* § 215.2(b)(1)(i). A person is *presumed* to have such "control" if

he is an executive officer or director of the company and he "directly or indirectly owns, controls, or has the power to vote more than 10 percent of any class of voting securities of the company"; if he is not a director or officer, a person may be presumed to have control if he owns more than 10 percent, and "no other person owns, controls, or has the power to vote a greater percentage of that class of voting securities." *Id.* § 215.2(b)(2)(i) and (ii).

chase was intended as an investment, and that all of the buyers expected to turn around and sell it at a profit. Sam Conner, another one-sixth owner and McCright's partner in CEK, testified at trial that they planned "to hold it for capital gains," and then "try to sell it in one block rather than break it up" shortly thereafter. Based on this evidence, McCright's participation in the joint venture to purchase and sell the Bedford ranch unquestionably constituted the type of business enterprise that should have been disclosed on the questionnaire. Moreover, the evidence overwhelmingly supports the jury's verdict that in failing to disclose this interest McCright intended to injure or defraud the bank in violation of section 1005. Therefore, we uphold the conviction on the third count of the indictment.

### Count Four: False Entry in a Bank Questionnaire II

The fourth count of the indictment charged McCright with falsely answering a question in a bank questionnaire dated June 17, 1982 (the "June questionnaire"), with intent to defraud the bank, in violation of 18 U.S.C. § 1005. McCright answered "none" to the following question:

*Question 8*

> With regard to yourself, your associates and/or any firm, corporation or other entity with which you have a position or relationship, please describe any material interest, direct or indirect, in any transaction occurring since January 1, 1981, or in any present or proposed transaction, to which FNB ... is or is to be a party.[5]

McCright advances three arguments for setting aside his conviction on this count.

First, he contends that none of his interests were "material," as that term is contemplated by the questionnaire. Second, he claims to have resigned as a director of FNB prior to filling out the questionnaire, thus removing him from the scope of section 1005. Finally, he argues that use of his negative answer to question eight would violate his Fifth Amendment right against self-incrimination. We consider McCright's contentions in turn, but find no merit in any of them.

As noted above, the bank prepared the June questionnaire in order to gather information for its 1982 proxy statement. Consistent with this purpose, the appendix to the questionnaire defined "material" as "those matters to which an average prudent investor ought reasonably to be informed before buying or selling the security registered." McCright asserts that this definition is too vague, and that its meaning in question eight must be gleaned from other questions in the form. Specifically, questions seven and nine also requested certain disclosures, but set the lower limit for disclosures at $5 million.[6] We cannot accept McCright's sophistic argument that because other questions on the form had a $5 million cutoff, question eight must have had the same. Indeed, his premise compels just the opposite conclusion: if a specific limit were intended on question eight it would have been stated therein. In any case, McCright's concern that a simple misreading of a bank form could lead to a felony conviction under section 1005 is misplaced. Under this section a defendant must be found to have made a false entry *with intent to injure or defraud* the bank.

---

5. The question emphasized that it "relates to indirect, as well as direct, material interests and transactions." It also explained that "[a] person who has a position or relationship with a firm, organization, or other entity which engages in a transaction with FNB or any of its subsidiaries may be considered to have an indirect interest in such transaction by reason of such position or relationship." The appendix to the June questionnaire defined "associate" as "any corporation or organization ... of which you are an officer or partner or of which you are directly

or indirectly the beneficial owner of 10% or more of any class of equity securities."

6. Question seven queried whether the respondent was "indebted at any time since January 1, 1981 to FNB in aggregate amount of $5 million or more." Question nine asked respondent-directors if they were or had been a director, officer, employee or owner of a ten percent equity in any firm that had made, or proposes to make, payments to, or was indebted to, FNB in excess of $5 million, within the last two fiscal years.

**234**

This necessary element was amply demonstrated in the present case.

McCright next claims that he resigned as a director on June 11, 1982, one week before completing the questionnaire, in a telephone conversation with Charles Fraser, the bank's president. Yet Agent Stroz of the FBI testified that McCright told him that he resigned in July, 1982. In fact, McCright signed the questionnaire, dated June 17, 1982, listing his title as "director." Based on this evidence, we cannot say that the jury erred in finding McCright to have been a director when he completed the questionnaire.

Finally, McCright invokes the "exculpatory no" doctrine, claiming that his answer on question eight cannot be used against him without violating his Fifth Amendment right against self-incrimination. We have excluded from 18 U.S.C. § 1001's coverage "mere negative responses to questions propounded ... by an investigating agent during a question and answer conference, not initiated by the [defendant]." *Paternostro v. United States*, 311 F.2d 298, 305 (5th Cir.1962). In *United States v. Lambert*, 501 F.2d 943, 946 n. 4 (5th Cir.1974) (en banc), we said that the "exculpatory no" decisions originate "at least in part from latent distate for an application of the statute that is uncomfortably close to the Fifth Amendment." However, this circuit has never applied the doctrine outside section 1001 cases, and, in fact, has specifically stated that the "doctrine is *only* a creature of section 1001." *United States v. Hajecate*, 683 F.2d 894, 901 (5th Cir.1982).

■ This case presents none of the circumstances usually associated with the "exculpatory no" notion. The bank form in question was not part of, or for use in, a government investigation; nor was it promulgated by a government agency or in accordance with a statute. *Hajecate*, 683 F.2d 900–901. The questionnaire was strictly administrative in scope, and did not implicate the defendant's Fifth Amendment rights. *Id.* We therefore, uphold the conviction on the fourth count of the indictment.

The convictions on counts one and two are reversed. The sentences are all vacated and the case is remanded for resentencing.

REVERSED and REMANDED.