**UNITED STATES of America, Plaintiff–Appellee,**

.v.

**Dale E. MITCHELL, Defendant– Appellant.**

**No. 93–6147.**

United States Court of Appeals, Tenth Circuit.

Jan. 28, 1994.

William Lee Borden, Jr., Assistant United States Attorney (John E. Green, United States Attorney and Vicki Zemp Behenna, Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for plaintiff-appellee.

Andrew M. Coats (Wesley C. Fredenburg, with him on the briefs), Crowe & Dunlevy, Oklahoma City, Oklahoma, for defendant-appellant.

Before KELLY and McWILLIAMS, Circuit Judges, and GODBOLD, Senior Circuit Judge.[1]

GODBOLD, Senior Circuit Judge.

Mitchell was convicted on five counts of violating federal banking laws. He contends that his motion for judgment of acquittal was improperly denied with respect to each count. We reverse the conviction on Count 6 and affirm the convictions on Counts 3, 4, 7 and 8. We vacate the order directing restitution and reverse for further proceedings concerning restitution.

### Count 6

■ This count charged a violation of 18 U.S.C. § 656, which makes criminal the willful misapplication of monies of a national or insured bank by an officer or director. It alleged that Mitchell "wilfully and knowingly misapplied and caused to be misapplied mo-

nies ... of Citizens National Bank ... by caus[ing] loan proceeds to be disbursed under a record which failed to disclose his interest in the loan." Mitchell was an officer of Citizens National. He owned all stock of Cuatro Explorations, Inc., which owned oil and gas properties. He had persuaded the owner of Tolex Energies, Inc., to switch its banking connections from another bank to Citizens National, and Tolex had been borrowing from Citizens National. The Tolex owner inquired about a loan, and Mitchell referred him to David Durrett, a loan officer of Citizens National. Tolex sought a loan of $1,300,000 to pay off a $1,000,000 note at another bank.

Durrett presented the Tolex application to the loan committee, which tabled it. This meant, he testified, that the application was discussed and that the committee did not fully understand it and needed more information. The committee was not comfortable, Durrett said, with lending approximately 60% of the value of the proposed collateral, consisting of oil and gas properties. Durrett prepared a second application for $1,100,000 based on lending approximately 50% of the value of the collateral, but the committee was still not comfortable because it did not make many loans secured by oil and gas assets. Durrett submitted the loan a third time for $1,000,000 and this was approved on July 29.

Durrett was asked:

Q. Did you also have discussions with Dale Mitchell regarding Tolex Energy's million dollar loan request?

A. Off and on, we discussed the relationship.

Tr. 651. Later he testified:

Q. In between the second and third time you take the Tolex loan to the loan committee, do you have a conversation with Dale Mitchell?

A. I probably would have updated Dale as to what was happening, since it was a big loan request and it was—I would be

---

1. The Honorable John C. Godbold, Senior U.S. Circuit Judge for the Eleventh Circuit, sitting by designation.

talking to him, since I knew it was a customer of his that he knew of.

Q. Did Dale agree with your assessment to try it one more time, the third time?

A. I'm sure I told him that we would go back to the committee again and go represent [sic] it. I had discussions, too, with Jimmy Phagan [the owner of Tolex] regarding—we were trying to pick up additional collateral to try to make the loan committee feel more secure about the loan.

Tr. 656–57.

There was no evidence that Mitchell appeared before or communicated with the loan committee.

While the Tolex loan application was under consideration by the loan committee Mitchell was negotiating a business relationship with Tolex. On July 31 Mitchell and Tolex entered into an agreement pursuant to which Mitchell sold to Tolex oil and gas properties owned by Cuatro, for which he received a promissory note for $220,000. He also received 20% of the common stock of Cuatro. And he was given an option to become a member of the board of directors of Tolex.

On August 2 the Tolex loan was closed, and Tolex executed a note to Citizens for $1,000,000. The proceeds were disbursed $750,000 to Tolex's debt at another bank and $250,000 to other Tolex notes at Citizens National.

On August 19 Mitchell wrote to the chairman of the bank's audit committee, disclosing his relationships with Tolex. In turn the chairman wrote Durrett to be certain that Mitchell had not been involved in consideration of the Tolex application. Durrett testified that in response to this inquiry he told the chairman that he did not know of "anything regarding any involvement by [Mitchell] with Tolex."

The indictment charged that Mitchell "misapplied and caused to be misapplied" funds of the bank. 18 U.S.C. § 656 requires that an accused either make a loan or influence the making in a significant way. There must be a causal connection between the defendant's actions as officer and the making of the loan. *U.S. v. McCright*, 821 F.2d 226 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). The evidence of a causal connection between Mitchell and approval of the loan was not sufficient that a reasonable jury could find Mitchell guilty beyond reasonable doubt.

In the district court the government contended that Mitchell violated § 656 by failing to discharge an affirmative duty to disclose his relationship with Tolex when he knew that Tolex had a loan application pending. On appeal it has shifted its position and, recognizing the necessity for a causal relationship, suggests that Durrett "sponsored" the loan for Mitchell's benefit and appeared before the loan committee "on Mitchell's behalf." There is not substantial evidence supporting those contentions. The motion for judgment of acquittal on Count 6 should have been granted.

### Count 7

■ This count charged that Mitchell knowingly made and caused to be made a material false statement to First City Bank for the purpose of influencing that bank to defer collecting payment of a loan made to defendant in the amount of $810,000. It charged:

> Specifically, the defendant falsely represented to the Bank that a promissory note payable to him and pledged as collateral to secure the $810,000 was still available to the bank as security, well knowing that the money due to him under that note had been paid in full.

First City made a loan to Mitchell for $810,000, secured by a promissory note from Fidelity of Oklahoma, Inc., to Mitchell in the amount of $1,387,103. Mitchell executed an absolute assignment to First City of the Fidelity note, but his promissory note to First City described the collateral as "Assignment of Net Proceeds and Promissory Note."[2] In

2. An assignment of net proceeds agreement refers to a practice among the banks under which bank A would be in physical possession of a note and entitled to proceeds to the extent of its secured debt, and banks B and C would give written notice to A that they too were secured by the proceeds of the same note to the extent of

November 1984 Mitchell gave First City a financial statement that listed as an asset the Fidelity note for $1,387,103. A note to this statement described the loan from First City as a demand note due no later than January 14, 1985 and said: "Secured by an assignment of net proceeds agreement and promissory note." All agree that the note referred to was the Fidelity note.

In October 1984 First City had made a memorandum that the Fidelity note had been presented for payment and funds were expected within a few weeks. However, in October and November Mitchell made loans from two other banks and secured each by the same Fidelity note, $215,000 from the Bank of Commerce and $250,000 from the First Oklahoma Bank.

First City postponed renewal of Mitchell's $810,000 note in January because, the bank noted in its files, the money due Mitchell from Fidelity was still outstanding. In February Fidelity paid Mitchell $1,000,000 in full settlement of its note. Mitchell notified the Bank of Commerce of the payment and arranged to pay that bank at a future date.

First City asked Mitchell in March for a current financial statement. He gave a statement dated March 31, 1985 that showed the First City debt of $810,000 as a note payable. A note to the statement said: "The note is secured by an assignment of net proceeds agreement and promissory note." Mitchell's list of assets in the March statement did not include the Fidelity note, and his total of notes and accounts receivable had been reduced from $3,059,142 in November to $1,756,420 in March. Mitchell contends that, because the March statement did not list the Fidelity note as an asset, the reference in the March financial statement to a promissory note and assignment of net proceeds agreement as security could not have described the Fidelity note, therefore the statement was not false. But there was no substantial evidence that the note to the March statement referred to some promissory obligation other than the Fidelity note. Moreover, the language in the March statement was substantially the same as that in the November statement. And the Fidelity

note had been assigned to two other banks as collateral and paid off in February. The jury could find from all these circumstances that, despite the March statement's not listing the Fidelity note as an asset, the language representing that the $810,000 note was "secured . . . by an assignment of net proceeds agreement and promissory note" was false and intended to deceive the bank into thinking that the Fidelity note still existed and was available as collateral, and intended to conceal that proceeds to which First City was entitled under the assignment of net proceeds agreement had been diverted elsewhere.

Mitchell was not entitled to a judgment of acquittal on the basis that First City was not attempting or contemplating collection of the loan at the time the March 1984 financial statement was given. The charge of Count 7 was that the material false statement was given for the purpose of influencing the bank to defer collecting payment of the Mitchell loan. The note evidencing the loan provided that it would become immediately due and payable if the collateral became unsatisfactory or insufficient either in character or value. The collateral that the jury could find was referred to by the financial statement was gone. It was not necessary to prove that the bank was actively influenced by the misleading statement. It is intent to influence that is vital, and actual reliance need not be proved in a § 1014 case. *U.S. v. Whitman*, 665 F.2d 313, 319 (10th Cir.1981).

Once the bank discovered that the Fidelity note had been paid it obtained new collateral from Mitchell and did not press for collection. Eventually the First City note was paid. These facts do not change the circumstances we have described that the jury could find to be a false representation.

The motion for judgment of acquittal was properly denied as to Count 7.

### Count 8

■ This count concerned Mitchell's using as collateral at another bank the same note for $1,387,103 referred to in Count 7. It

their respective secured debts though subor-

dinate to A's rights.

charged that Mitchell violated 18 U.S.C. § 1014 by making a material false statement to First Oklahoma Bank for the purpose of influencing its action in making a loan to him of $250,000; specifically that Mitchell pledged as collateral a promissory note payable to him, falsely stating that the note had been pledged to secure a loan only at the Bank of Commerce, while knowing that the same note had also been pledged to First City Bank to secure a loan from it.

A loan officer from First Oklahoma testified that Mitchell gave the Fidelity note as collateral for a $250,000 loan and orally stated to him that the note already was pledged as collateral securing a loan from Bank of Commerce of $335,000 but did not disclose that it also had been pledged as collateral for a loan from First City Bank. The loan officer, therefore, understood that his bank was in second position to claim the proceeds of the Fidelity note when, in fact, it was in third position.

Mitchell contends that he was not asked whether the Fidelity note was pledged to secure any debt other than the debt to Bank of Commerce, and that a jury could not convict him for giving a false answer to an inquiry never made. The short answer to this is that Mitchell signed a security agreement [Exhibit 8–D] that granted to First Oklahoma a security interest in all proceeds of the Fidelity note. A jury could find that Mitchell made a false statement when he made an oral statement the import of which was that "all proceeds" really meant the face amount less the Bank of Commerce security interest when in fact it meant less the First City security interest as well. Also, Mitchell gave the Bank of Oklahoma a financial statement that showed the Fidelity note as an asset and listed the note of $810,000 to First City Bank as a liability "secured by an assignment of net proceeds agreement." But this reference did not identify the Fidelity note as the asset subject to the assignment to First City.

Mitchell says that his statement was not material because, first, when First Oklahoma learned (from bank examiners) that it was third in line on the security it called on Mitchell for additional collateral which he supplied, and, second, he eventually paid the First Oklahoma note. These arguments are frivolous.

### Counts 3 and 4

Mitchell was the majority stockholder of Tulsa Bankshares and was on its board of directors. Tulsa Bankshares was suffering from insufficient capital, and it had entered into an agreement with the Federal Reserve Bank to improve its financial position. Mitchell was endeavoring to raise funds to satisfy the requirements of this agreement. Count 3 charged that Mitchell conspired with others to use his influence to require Management Assistance Group, Inc. (MAGI), to borrow $1,200,000 from Citizens National and use the funds to purchase stock in Tulsa Bankshares, as a condition of First Citizens' funding a $1,000,000 loan previously requested by MAGI. Count 4 is a substantive count charging that Mitchell unlawfully demanded and caused to be demanded a thing of value for Tulsa Bankshares by demanding, as a condition of funding the requested $1,000,000 loan, that MAGI borrow another $1,200,000 from Citizens National and use the funds to purchase Tulsa Bankshares stock. The "thing of value" was the improvement in the capital position of Tulsa Bankshares by MAGI's purchase of its stock.

Mitchell contends with respect to these counts that the government's evidence was so contradictory and incredible that reasonable minded jurors necessarily must conclude that there was reasonable doubt of his guilt. A principal of MAGI described a meeting attended by Mitchell where he gained the feeling that MAGI would not receive the $1,000,000 loan though MAGI had previously been told that the loan was approved and had made commitments based upon that approval. Mitchell does not deny that a meeting occurred and that there was testimony tending to show that pressure was exerted on the principals of MAGI to make the $1,200,000 loan. Rather he points to aspects of the government's evidence that he says cast doubt on the completeness, reliability and credibility of testimony concerning the time and place of the meeting, the persons present, and the content of specific

statements made. Also he attacks the credibility of Charles Nazarian, a government witness who testified that he was at the meeting. In considering the sufficiency of the evidence to support the jury's verdict we consider it in the light most favorable to the government, and we do not rule on credibility or weight of conflicting evidence. *U.S. v. White*, 673 F.2d 299, 301 (10th Cir.1982); *U.S. v. Lopez*, 576 F.2d 840, 843 (10th Cir. 1978).

### Restitution

 After a sentencing hearing the district court ordered Mitchell to pay restitution of $3,039,740, in amounts to be determined by the probation office.[3]

■ We would review under a clearly erroneous standard factual findings underlying the restitution order, *U.S. v. Grimes*, 967 F.2d 1468 (10th Cir.1992); *U.S. v. Teehee*, 893 F.2d 271 (10th Cir.1990), but we are directed to no findings of fact in the record. For several reasons we vacate the restitution order and remand to the district court on that issue.

The district court made no specific finding that Mitchell is able to pay any restitution. Arguably such a finding is implicit in its order that he pay $3,037,740. But we do not know what underlying fact findings would support a finding of ability to pay. The PSI showed Mitchell as currently unemployed. It listed assets of $8,000 plus, liabilities of $4,156,358, a negative net worth of $4,148,-346, monthly income (from spouse's salary) of $4,180, and negative monthly cash flow of $2,615. The PSI concluded that Mitchell does not have the ability to pay restitution. The court stated that it had considered the PSI, but it did not refer to the recommendation that Mitchell could not pay anything.

Additionally, the prosecution presented to the court a letter addressed to the judge from the Federal Deposit Insurance Corporation. It outlined that agency's analysis of losses it said it had incurred as a consequence of Mitchell's wrongs. Counsel for Mitchell strongly objected to the letter on the ground that he had received it only the

day before the hearing and that it embraced transactions not a part of the case. The letter requested a substantial prison sentence and restitution of not less than $2,705,681.88. It said that Mitchell defrauded Citizens Bank of several million dollars, obtained money under false pretenses, and used loan proceeds for purposes other than stated to obtain the loan. Mitchell was not convicted of any such offenses. The letter listed 20 failed banks that FDIC said Mitchell was "involved with" or "associated with" as director, officer, influencing shareholder, borrower, or some combination of these, having total assets of more than $11,000,000,000. Which, if any, of these banks suffered any loss as a result of Mitchell's "association" or "involvement" was not stated. Delivery of the letter to defense counsel only one day before the hearing was not explained. Defense counsel expressed his outrage at the letter's presentation, the delay in furnishing him a copy, and the contents of the letter. The district judge announced that he had received the letter and reviewed it and would consider it for whatever the court deemed it was worth and appropriate. We do not know what, if any, reliance the judge gave to the letter.

Finally, in this court the government concedes that the amount of restitution directed must be modified to eliminate $370,852.22, an amount relating to a victim not connected to any charge on which Mitchell was convicted and $101,000 in attorney fees not directly related to Mitchell's criminal conduct. Also, our reversal of Count 6 would, by itself, require the court to revisit the restitution order.

Whether Mitchell has the ability to pay any restitution is sharply contested. It is not necessary for us to recite the facts pro and con that came out at trial and bear on that issue since the entire matter of restitution must be readdressed.

AFFIRMED in part, REVERSED in part and VACATED in part.

---

**3.** Mitchell represents to us that the probation office has ordered payments of $50.00 per month.