IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-20464
_____

UNITED STATES OF AMERICA,
                    Plaintiff-Appellee,


VERSUS


MICHAEL PARKS, JULIAN MOSS, AND CHARLES MICHAEL O'NEAL,
                    Defendants-Appellants.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(CR. H-92-244)

October 26, 1995

Before KING and JONES, Circuit Judges, and KAZEN, District Judge.[*]

KAZEN, District Judge:


Defendants Michael Parks, Julian Moss, and Charles Michael O'Neal were charged with conspiring to misapply funds from a federally insured financial institution and to make false entries in the books and records of the institution in violation of 18 U.S.C. §371 (Count One); misapplication of funds, in violation of 18 U.S.C. §657 (Count Two); and making false entries in the books and records of the institution, in violation of 18 U.S.C. §1006

_____

[*]    District Judge for the Southern District of Texas, sitting by designation.

(Count Three).  All three Defendants were convicted on Counts One and Two.  Moss and O'Neal were convicted on Count Three, but Parks was acquitted.  All Defendants have appealed.  First, they challenge the sufficiency of the evidence to support their convictions.  Second, they claim that the trial court committed reversible error in admitting testimony concerning civil banking regulations.  Third, they claim that pre-indictment delay violated their Fifth Amendment due process rights.  We affirm.

I.

BACKGROUND

At the time of the transaction in question, Defendants Parks and Moss were the named shareholders in a Houston law firm.  Both were instrumental in establishing a federally insured savings and loan, Village Savings Association ("Village"), which became a client of the firm.  In addition to being investors in and counsel for Village, Parks served as Chairman of the Board and Moss as Secretary to the Board.  Defendant O'Neal, who was not affiliated with the law firm, served as the President of Village.

Also among the law firm's clients was a Canadian condominium developer, Len Cassack ("Cassack"), and his joint venture, West Oaks Development 100 ("WOD").  As was customary at the time to qualify for development loans, Cassack recruited investors to sign earnest-money contracts ("pre-development contracts") to buy unbuilt condominium units at a discount price.  If Cassack sold the unit at a higher price prior to completion, the pre-development

2

investor would keep the profit. If no buyer was found, the investor would be required to purchase the unit under the terms of the pre-development contract. In the late 1970's, Parks and Moss, through an investment partnership known as Parks and Moss II ("P&M II"), signed pre-development contracts for two units in Cassack's Briar Hollow project. As contemplated, the Briar Hollow units later were sold by Cassack, and P&M II made a profit.

In 1981, Cassack approached Parks and Moss with a similar investment opportunity in a different development. Along with three partners in the law firm[1], Parks and Moss formed an investment group called Parks and Moss III ("P&M III"), which signed two pre-development contracts for condominium units in Cassack's Park Square project. Prior to completion, Cassack sold one unit but could not find a buyer for the second unit ("Unit 802"). In November 1981, P&M III was required to purchase Unit 802 at the pre-development contract price of $223,448.00. Several years later, Village agreed to buy Unit 802. On August 31, 1984, P&M III transferred the title to Cassack's WOD, which simultaneously transferred title to Village. WOD received nothing for its participation in the transfer. Village's money was disbursed by the title company, partly to pay off P&M III's mortgage and the balance going to P&M III as profit.

In December of 1985, the participation of P&M III in the transaction came to the attention of Village's Board of Directors. Recognizing potential regulatory violations due to Parks'

---

[1] Frank Ban, George Bamberg and Jerry Schutza.

involvement, the board initiated an internal investigation. Parks and Moss were asked to resign in early 1986. A subsequent investigation by the Federal Home Loan Bank Board (FHLBB) resulted in an indictment against the Defendants on October 13, 1992.

## II.

### INSUFFICIENCY OF THE EVIDENCE

All Defendants challenge the sufficiency of the evidence on all of their convictions. "In reviewing a verdict challenged on the sufficiency of the evidence, this Court views the evidence, whether direct or circumstantial, and all reasonable inferences drawn from the evidence, in the light most favorable to the jury's verdict ... [to] determine whether `a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt'." *United States v. Willis*, 6 F.3d 257, 264 (5th Cir. 1993) (citations omitted).

A. Misapplication of Funds

To establish misapplication of funds in violation of 18 U.S.C. §657, the government must show: (1) that the savings and loan institution was authorized under the laws of the United States; (2) that the accused was an officer, director, agent or employee of the institution; (3) that the accused knowingly and willfully misapplied the monies or funds of the institution; and (4) that the accused acted with intent to injure or defraud the institution. *See United States v. Tullos*, 868 F.2d 689, 693 (5th Cir.), *cert. denied*, 490 U.S. 1112 (1989).

4

*Intent*

All Defendants dispute the sufficiency of the evidence on the intent element. Intent "is proven by showing a knowing, voluntary act by the defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive." *United States v. Parekh*, 926 F.2d 402, 408 (5th Cir. 1991) (citation omitted). Intent may be shown by direct or circumstantial evidence that allows an inference of an unlawful intent. *United States v. Aggarwal*, 17 F.3d 737, 740 (5th Cir. 1994).

Moss' secretary, Patricia Wellborn, testified that Moss and O'Neal arranged the transfer of Unit 802 to Village, through WOD, in order to avoid drawing the auditors' attention to Parks' participation. According to Wellborn, O'Neal told Moss that auditors and regulators might question why Village was buying a condominium from P&W III at the price in question, and that there would be "less questions asked" if Unit 802 were not sold by P&M III "directly" to Village. There was also evidence from which the jury could infer that O'Neal was familiar with applicable banking regulations, but nevertheless completed the transaction without seeking approval from his board or from the FHLBB. The Defendants stoutly maintain that Unit 802 was worth the purchase price of $300,000.00. However, there was evidence from which a reasonable jury could find that the market for condominiums was poor in 1984, that no unit of comparable size had sold for $300,000.00 that year, and that Unit 802 would not have been worth the purchase price on

5

the open market. The evidence would also allow a reasonable jury to reject O'Neal's contention that Unit 802 was a good investment for resale by Village or that it was useful to house out-of-town customers and investors. Indeed, Village still owned Unit 802 some 16 months after the purchase, and the unit was unfurnished and apparently unused.

*Causation*

Parks and Moss contend that there was insufficient evidence to show that they caused any misapplication of funds. In *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990), we found it unnecessary to decide if the causation standard applicable to a violation of 18 U.S.C. §656 should similarly apply to a violation of 18 U.S.C. §657. The two sections are virtually identical except that one applies to banks and the other to savings and loan associations. We now hold that the same standard should apply under both statutes.

In *United States v. McCright*, 821 F.2d 226, 230 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988), we said that "[m]anifest in the use of the term 'misapply' is a requirement that the defendant made, or influenced in a significant way, as an officer of the bank, the decision to extend the loan." *McCright* involved a bank loan made to a corporation for development of a golf course and country club. The defendant, a bank officer, had a personal financial interest in the corporation which was concealed from the bank. He was not, however, the loan officer who approved the loan, and the officer who did approve the loan apparently had no criminal

6

knowledge or intent.  We held that §656 required not merely that a defendant stood to benefit from the loan but that he authorized or caused it to be authorized.  Invoking *McCright*, Parks and Moss contend that at most they only benefitted from a loan which they neither authorized nor caused.

This argument ignores the theory of aiding and abetting, which is implicit in all indictments for substantive offenses.  *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 711 (1995).  The instant indictment cited both the substantive statutes and 18 U.S.C. §2.  The trial judge also charged the jury on aiding and abetting.  Under this theory, the government need not show that Parks and Moss were guilty of every element of the crime. *See Parekh*, 926 F.2d at 407.  Unlike the situation in *McCright*, the present case involved three Defendants acting in concert to accomplish the misapplication of funds.  Thus, the government need only show that the Defendants willfully associated themselves with and participated in a criminal venture, seeking to make the venture succeed, and that each element of the offense was committed by some party to the venture.  *See United States v. Beuttenmuller*, 29 F.3d 973, 981-82 (5th Cir. 1994).  In this case, there is evidence that O'Neal actually caused the loan to be made.  The testimony of Patricia Wellborn was sufficient to support a finding that Moss willfully associated himself with O'Neal in the criminal venture and sought to make that venture succeed through his directions to his own secretary.

Although the evidence of Parks' role in the venture is not as

7

direct, the evidence showed that Parks was a founder of Village, the chairman of its Board of Directors, and a member of its Executive Committee. Parks and Moss were also majority owners of P&M III, each holding approximately a 40% interest. That partnership had owned Unit 802 for three years and had been unable to sell it. It was becoming a financial drain and the partners were eager to sell. Prior to the ultimate sale of Unit 802, Parks and Moss had advised their fellow investors that the unit was going to be purchased by Village, although the Board of Directors had not been apprised of that circumstance. When the transaction was actually consummated, however, Parks and Moss signed a deed to WOD rather than to Village. The following year, when confronted by another member of the Board of Directors, Parks initially stated that he was unaware that Village had purchased Unit 802.

Parks suggests that his acquittal on Count Three, the false entry count, should impact the Court's sufficiency analysis with regard to Counts One and Two. This argument is without merit as it is well established that juries are entitled to render inconsistent verdicts. *United States v. Powell*, 469 U.S. 57, 64-65 (1984). Indeed, this Court has held that "a not guilty verdict on one count does not establish any facts favorable to the defense for the purpose of determining the sufficiency of the evidence on the counts of conviction." *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994). In this case, albeit not necessarily in all cases, the misappropriation under §657 was aided and implemented by means of documents placed in the records of Village which disguised

8

the true nature of the purchase of Unit 802.

In *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir.), *cert. denied*, 115 S.Ct. 193 (1994), we found sufficient evidence to convict an appraiser, not a bank official, of a §657 violation under an aiding and abetting theory. The appraiser had an undisclosed profit interest in certain property and prepared a false appraisal used by a cooperating bank officer to justify a loan allowing sale of the property at a price that would assure the appraiser a profit. Similarly, in *United States v. Kington*, 875 F.2d 1091, 1103 (5th Cir. 1989), we upheld the conviction of one bank officer who "withheld objections to and informations about (another bank officer's) unlawful loans in order to reap the benefits of the continuing scheme."

In the instant case, while Parks and Moss did not directly make or authorize the appropriation of funds to purchase Unit 802, there was sufficient evidence to support a jury finding that they aided and abetted O'Neal in committing that offense.


B.  <u>False Entries</u>

O'Neal and Moss challenge the sufficiency of the evidence to support their convictions for making false entries. To establish a violation of 18 U.S.C. §1006, the government must show: (1) that the institution is a lending institution authorized and acting under the laws of the United States; (2) the defendant was an officer, agent, or employee of the institution; (3) the defendant knowingly and willfully made, or caused to be made, a false entry

9

concerning a material fact in a book, report, or statement of the institution; and (4) the defendant acted with intent to injure or defraud the institution or any of its officers, auditors, examiners, or agents. *Beuttenmuller*, 29 F.3d at 982; *Tullos*, 868 F.2d at 693-94. Material information is that which has the capacity to impair or pervert the functioning of the institution. *Beuttenmuller*, 29 F.3d at 982. A false entry can be either an omission of material information or a misstatement. *United States v. McCord*, 33 F.3d 1434, 1448 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 2558 (1995). Neither defendant disputes the proof of elements one and two.

The "material" information in this case was P&M III's involvement in the transaction, the omission of which had the capacity to "pervert the functioning" of Village. As we have previously discussed, there was evidence indicating that Moss and O'Neal deliberately arranged to prepare documents showing WOD rather than P&M III as the seller of Unit 802. Indeed, Wellborn testified that the discussion of that arrangement occurred after initial deeds had already been prepared, apparently implying that the transaction had first been structured directly between P&M III and Village. Village's treasurer testified that his file on Unit 802, which he considered complete, contained only a closing statement reflecting a sale between WOD and Village, with a copy of the $300,000.00 check from Village to the title company. From this evidence, the jury could conclude that the Defendants caused an omission of material information to exist in the Village files.

10

Defendants point to a letter by Frank Ban, a investor in P&M III, which was written several months after the purchase of Unit 802 and which was placed in the Village file. The letter was addressed to O'Neal and forwarded homestead exemption information forms. In passing, the letter refers to a condominium purchased by Village "from Parks and Moss III." The letter refers to Unit 602 of the Park Square I Condominiums, but presumably was intended to refer to Unit 802. In any event, the timing of this letter, the reason it was sent, and the fact that it was authored by a person not an officer at Village would not necessarily negate the conclusion that months earlier, in August 1984, Moss and O'Neal conspired to make a false entry on the books of the institution.

The Defendants also speculate on the possible existence of a missing file for Unit 802, which might have contained information revealing the connection between P&M III and the transaction. There was no solid evidence, however, that any such file existed and there was evidence from which a reasonable jury could find that no such other file did exist.

O'Neal and Moss also argue that the Government is impermissibly using a civil violation as the basis for a criminal conviction. Irrespective of any civil violations, the evidence in this case supports the jury's finding that O'Neal willfully omitted a material fact with the intent to defraud the institution and the auditors, a violation of 18 U.S.C. §1006. Moss' conviction for false entries is supported under an aiding and abetting theory.

C.  <u>Conspiracy</u>

Count One of the indictment charged all three Defendants with the crime of conspiracy in violation of 18 U.S.C. §371.  The indictment alleged that the defendants conspired to commit two separate offenses, misapplication of funds in violation of 18 U.S.C. §656 and making false entries in Village's books in violation of 18 U.S.C. §1006.  To establish a §371 conspiracy, the government must prove, first, that two or more people agreed to pursue an unlawful objective; second, that each defendant voluntarily agreed to join the conspiracy; and third, that one or more members of the conspiracy performed an overt act to further the objectives of the conspiracy.  *Beuttenmuller*, 29 F.3d at 978-79.  When a conspiracy to violate two statutes is alleged, the jury may find the defendant guilty if the evidence establishes beyond a reasonable doubt that the defendant conspired to violate either one of the statutes.  *United States v. Lyons*, 703 F.2d 815, 821 (5th Cir. 1983).

In this appeal, the Defendants do not directly address the conspiracy count other than to list the elements under §371 and state that they challenge the sufficiency of the evidence.  Based on the evidence we have recited above, we find enough to support a conviction under Count One.

III.

CIVIL BANKING REGULATIONS

All Defendants claim the trial court committed reversible error by admitting testimony that certain civil banking regulations

12

were violated.[2]   Evidence of violations of civil banking regulations cannot be used to establish criminal conduct. *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980).  Evidence of such violations may, however, be admitted for the limited purpose of showing the defendants' motive or intent to commit the crime charged.  *See United States v. Cordell*, 912 F.2d 769, 774-76 (5th Cir. 1990).  The trial court denied Defendants' pretrial motion *in limine* to exclude evidence of the alleged bank regulation violations, but limited use of the evidence to the issue of intent or motive.  We review a trial court's evidentiary rulings for abuse of discretion.  *United States v. Brechtel*, 997 F.2d 1108, 1114 (5th Cir.), *cert. denied*, 114 S.Ct. 605 (1993).

All three Defendants argue that the court erred in admitting this evidence because there was no proof that they knew of the regulations.  In response, the government points to the testimony of two former Village board directors regarding their own familiarity with the regulations.  The government argues that the jury could infer that the Defendants were similarly familiar with the regulations.  Also, Parks testified that, upon learning Village was going to buy Unit 802, he asked O'Neal whether they needed board approval, and that he generally relied on O'Neal's familiarity with and knowledge of the regulations.  The testimony of Wellborn that Moss and O'Neal discussed changing the structure

---

[2]   The "banking regulations" which Defendants allegedly violated were 12 C.F.R. §§563.41 (affiliated persons restrictions) and 571.2 (conflict of interest), which at the time were regulations of the Federal Home Loan Bank Board.

of the transaction to raise fewer questions by regulators also supports a finding that they knew of the regulations. The trial court did not abuse its discretion in admitting this evidence to show intent.

Defendants also claim that the court's admonishments to the jury did not cure the "repeated reference[s] to non-criminal misconduct" which "infected the purpose of the trial." *See*, *e.g., Christo*, 614 F.2d at 492. The references made during trial were: (1) testimony that the board often discussed conflicts of interest and the need to make disclosures to the board; (2) testimony that Village contacted the FHLBB because the Unit 802 transaction was a potential conflict of interest; (3) the testimony of William Couhig, an examiner with the Office of Thrift Supervision, regarding prohibitions against buying or selling from parties affiliated with a savings and loan institution; and (4) several references to the foregoing testimony in the government's closing argument.

These references to regulatory violations comprise approximately thirteen pages out of approximately 700 pages of trial transcript. At one point in the trial, the district court told the jury that "[c]ivil charges are not charges that are criminal and they do not support criminal charges. So don't get mixed up between civil and criminal." In its closing argument, the government argued that while the civil regulations and violations . . . are not violations of the law . . . [the testimony] may be helpful for you in considering the motivation and intent to commit

14

the crimes that are charged."  In addition, in charging the jury, the court stated:

> Now, you have heard testimony that the failure to disclose the sale of property by an affiliated person to the financial institution may be a violation of civil banking regulations.  A violation of a civil statute or regulation is not a criminal offense.  Such a violation would merely subject an institution or, in some cases an individual, to civil penalties which is not the same as a crime.
>
> You must not consider any evidence concerning civil disclosure regulations in deciding only if the defendant committed the acts charged in the indictment.  The only reason that this evidence was admitted was for the purpose of your determining if it aids your determination, whether the defendants had the intent and purpose of violating the law as charged in the indictment.  Before you may consider such reasonable doubt from other evidence in the case that the defendant violated the law as charged in the indictment.  If you are so convinced, then this evidence may be considered by you, if you believe it helpful, in determining whether or not the defendant had a motive or intent to commit the crimes charged in the indictment.

We conclude that the testimony regarding civil regulatory violations did not impermissibly infect the purpose of trial, and the trial court did not abuse its discretion in permitting evidence of the civil regulations.

IV.

PREJUDICIAL PRE-INDICTMENT DELAY

Before trial, Defendants filed motions to dismiss their indictments on the ground that they had been prejudiced by the government's eight-year delay in bringing charges, thereby violating their due process rights.  To prevail on these motions, Defendants had to prove the threshold requirement of actual

15

prejudice.[3] *United States v. Lovasco*, 97 S.Ct. 2044, 2048-49 (1977); *United States v. Beszborn*, 21 F.3d 62, 66 (5th Cir.), *cert. denied*, 115 S.Ct. 330 (1994). The trial court denied the motions because it had not "heard anything that comes up to the level of prejudice to the Defendants." Prejudice findings are reviewed under the clear error standard. *Beszborn*, 21 F.3d at 66.

Defendants argue that the death of two potentially material witnesses in the eight-year gap between the Unit 802 sale and the indictment prejudiced their cases. However, because these witnesses both died in 1985, before the investigation of the Unit 802 sale even began, any delay in prosecuting this case did not cause whatever prejudice resulted from their deaths. Defendants also contend that the death of the real estate appraiser who performed the 1981 and 1982 appraisals of Unit 802 prejudiced their cases. These appraisals were admitted into evidence without any challenge from the government, and we fail to discern any prejudice. Defendants also argue that O'Neal's recollection that an appraisal of Unit 802 had been performed in 1984 could not be corroborated because the alleged appraiser had purged his records

---

[3] In its appellate brief, the government argued that the Defendants were required to show both prejudice and deliberate governmental delay to prevail. *See United States v. Beszborn*, 21 F.3d 62, 65-66 (5th Cir.), *cert. denied*, 115 S.Ct. 330 (1994). While the appeal was pending, a panel of this Court held that the defendants did not have to show deliberate governmental delay. *United States v. Crouch*, 51 F.3d 480, 483 (5th Cir. 1995). *Crouch* will now be heard *en banc*, so that the panel opinion currently has no precedential value. *United States v. Pineda-Ortuno*, 952 F.2d 98, 102 (5th Cir.), *cert. denied*, 112 S.Ct. 1990 (1992). Nevertheless, since we find no prejudice from the delay in this case, we do not reach the question of deliberate delay.

and had no independent recollection of performing that appraisal. No other witness recalled having heard of or seen such an appraisal, and we conclude that the claim of prejudice is speculative, not actual. The Defendants also complain of missing Executive Committee meeting minutes showing approval of the acquisition of Unit 802, but the evidence did include a 1986 letter from O'Neal stating that he and Herb Axelrad approved the transaction at a meeting that Parks did not attend and at which Moss did not vote.

Lastly, Defendants point to the failing memory of Wellborn regarding the circumstances surrounding the preparation of the documents for the Unit 802 transaction. Her statement before trial was firm--that she was asked to change the documents to conceal the P&M III ownership. At trial she equivocated, claiming she did not know if she actually heard that information from the Defendants prior to the sale or whether the information came only from accusations made by others after the sale. After carefully reviewing her testimony, we conclude that her equivocation tended to operate more to the Defendants' advantage than to their prejudice.

For the foregoing reasons, the convictions of all Defendants are AFFIRMED.

**17**