<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1392

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                   JOSE F. BLASINI-LLUBERAS,

                      Defendant-Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                             Before

                   Boudin, Lynch, and Lipez
                       Circuit Judges.
                                
                                

 Roberto Boneta for appellant.
 Jorge E. Vega-Pacheco, Assistant United States Attorney,
with whom Guillermo Gil, United States Attorney, and Nelson Prez-
Sosa and Thomas F. Klumper, Assistant United States Attorneys, were
on brief for appellee.

January 25, 1999

                                
                                
 LIPEZ, Circuit Judge.  On April 5, 1995, a federal grand
jury returned a multiple count indictment against defendant Jose
Blasini-Lluberas ("Blasini"), a former executive vice president of
Ponce Federal Bank, and his co-defendant, Ramiro Coln-Muoz
("Coln"), president of the bank.  The indictment charged both
defendants with five counts of misapplication of bank funds under
18 U.S.C.  657, one count of bank fraud under 18 U.S.C.  1344,
one count of false entry under 18 U.S.C.  1006, one count of
benefitting, directly or indirectly, from the loan transactions in
question under 18 U.S.C.  1006 and one count of conspiracy under
18 U.S.C.  357.  The jury returned guilty verdicts against
Blasini on all but one count, acquitting him on the charge of
benefitting from the loan transactions. On appeal, Blasini
challenges the sufficiency of the evidence to support the verdict,
instructions to the jury, and several aspects of the sentence. For
the reasons discussed below, we conclude that there was
insufficient evidence to support the jury verdict on four of the
five counts of misapplication of bank funds and order an acquittal
as to those counts. Finding no reversible error in the jury
instructions, we affirm the remaining convictions and remand for
re-sentencing.  
                              I.
    From a review of the evidence in this case, the jury
could have found the following.  On July 15, 1987, co-defendant
Ramiro Coln, president of Ponce Bank, and his wife purchased a
farm from thirteen members of the Usera family who had inherited
the farm from Julio Usera Santiago.  The total purchase price for
the farm, known as "La Esmeralda" and located in the municipality
of Salinas, Puerto Rico, was $555,600.  Coln paid $83,340 at the
closing with the remaining balance due nine months later on April
14, 1988.  The agreement provided that no interest would be due on
the outstanding balance.  As security for the $472,260 balance,
Coln granted the Usera family a mortgage on the property.
    Following Coln's purchase of the farm, but prior to the
due date of Coln's outstanding $472,260 obligation, four members
of the Usera family approached Coln requesting money.  Monserrate
Usera and her sister Ana Usera were the first two, approaching
Coln in August of 1987 for money to pay off personal debts:
Monserrate needed funds to pay student loans and her daughter's
college tuition; Ana Usera needed funds to make repairs to a
building.  Although Monserrate Usera understood that Coln's
obligation to the family was not due until the spring of 1988, she
went to Coln for an advance.  Coln said he would look into
getting her the funds she needed.  Monserrate explained that when
Coln agreed to help her, she understood that she would be taking
out a loan from the bank, the obligation for which was hers alone.  
Ana Usera also decided to contact Coln in an effort to obtain
money to pay off her current debts since it was taking such a long
time to complete the sale of the farm.  Ana explained that, after
Monserrate Usera made the initial contact with Coln, they both
decided to "make a loan."   Although Ana understood that she and
her sister had other options, she thought it best to take out a
loan from the bank to satisfy her outstanding obligations.  
    Subsequent to these discussions, Coln sent the sisters
to see Blasini, then an executive vice president of Ponce Federal
Bank. Coln instructed Blasini to assist each of them in securing
a loan from the bank, which he did.  As vice-president of the bank,
Blasini was authorized to approve unsecured loans up to $50,000 and
secured loans up to $100,000. When the sisters arrived, he
authorized an $11,000 loan for each, subject to a rate of interest
and a due date.  Neither loan application included a financial
statement or credit history. Monserrate Usera and Ana Usera signed
the promissory notes and executed partial assignments of their
mortgage interests in the farm as security for the loans. The
partial assignments were signed by both Blasini and Coln but were
not included in the loan file. The stated purpose for the loans was
personal; the means of repayment was the sale of a farm. Because
the loans did not exceed $50,000, their approval did not require
collateral.
    In January of 1988, Carmen Maduro Usera, the mother of
Monserrate Usera and Ana Usera, received a loan from Ponce Federal
Bank under similar circumstances.  Although the loan documentation
was introduced at trial, Carmen Maduro died before trial and her
testimony was never taken. Ana Usera testified that she helped her
mother make arrangements over the phone to obtain a $15,000 loan
and then accompanied her mother to the bank.  The documents
themselves indicated that Blasini authorized the loan, that the
purpose of the loan was personal and that it was needed to pay off
an outstanding $5,000 loan to the bank. The promissory note set a
rate of interest and a due date for repayment. Although the
application did not include a financial statement or credit
history, it noted that Carmen Maduro was well known to the Coln
family. Carmen Maduro also executed a partial assignment of her
mortgage interest as security for the loan one day after the loan
was disbursed to her, signed by Blasini and Coln, but it did not
appear in the loan portfolio.
    In March of 1998, Vincente Usera Tous received a $20,000
loan from the bank, authorized by Blasini.  Vincente Usera also
died prior to trial and never testified about the loan transaction.
Although he was a member of the Usera family, he did not stand to
inherit proceeds from the sale of the farm. Instead, he was due a
commission of $23,613 for his assistance in brokering the sale of
the farm. His loan application, admitted in evidence, was missing
a financial statement and a credit history, but the application
stated that he was well known to the bank, in particular to Coln,
and that he was a responsible person. The stated means of repayment
was the commission from the sale of a farm.
    When Coln's debt to the Usera family came due on April
14, 1988, he was unable to meet his obligation. On April 19, 1988,
another member of the Usera family, Consuelo Garcia-Gomez, went to
the bank and demanded payment of her share of the purchase price.
Consuelo Garcia-Gomez was entitled to $200,000, the largest share
of the inheritance.  Wendell Coln, Coln's brother, told Consuelo
Garcia-Gomez that the money was not immediately available.  She
then asked for $100,000. Thereafter, Blasini brought Consuelo
Garcia-Gomez to a loan officer and instructed the officer to
disburse a $100,000 loan to her. The information in her loan
application was provided to the loan officer by Blasini and the
application stated that collateral for the loan was a partial
assignment of Consuelo's mortgage interest in the farm. The listed
purpose of the loan was the purchase of an apartment. Directly
above Blasini's signature, Blasini wrote, "discussed and agreed to
by attorney R.C. Coln."  At trial Consuelo Garcia-Gomez explained
that, although she signed loan documents to receive the $100,000,
she did not go to the bank to obtain a loan and she never read the
loan documents before signing the documents.  She maintained that
the $100,000 was partial payment of the money owed to her rather
than a loan.  
    A few weeks later, in May, Coln wrote two sets of
checks.  The first set paid off the debts of Monserrate Usera, Ana
Usera, Carmen Maduro, Vincete Usera and Consuelo Garcia-Gomez. He
listed the appropriate amount of their outstanding debts and named
both the bank and the borrower as joint payees. The second set paid
each Usera the balance of what he or she was owed. Each member of
the Usera family then signed a cancellation of the mortgage.
    On December 19, 1996, a jury convicted Blasini of the
charges described herein. On February 23, 1998, he was sentenced to
thirteen months imprisonment to be followed by two years supervised
release. He was fined $8,000.  Blasini now appeals.
                             II.
A. Sufficiency of the Evidence
    When there is a challenge to the sufficiency of the
evidence to support a guilty verdict, "the relevant question is
whether, after viewing the evidence in the light most favorable to
the prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt." Jacksonv. Virginia, 443 U.S. 307, 319 (1979). A conviction may rest, in
whole or in part, on circumstantial evidence. See United States v.
Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993). It is well
established that "an appellate court plays a very circumscribed
role in gauging the sufficiency of the evidentiary foundation upon
which a criminal conviction rests." United States v. Woodward, 149
F.3d 46, 56 (1st Cir. 1998).  Nevertheless, we have cautioned that
"[d]espite the deference that characterizes appellate review of
jury verdicts, juries do not have carte blanche. The appellate
function . . . requires the reviewing court to take a hard look at
the record and to reject those evidentiary interpretations and
illations that are unreasonable, insupportable, or overly
speculative." Id. (quoting United States v. Spinney, 65 F.3d 231,
234 (1st Cir. 1995)). We noted that "[t]his function is especially
important in criminal cases, given the prosecution's obligation to
prove every element . . . beyond a reasonable doubt." Id. at 56-57
(quoting Spinney, 65 F.3d at 234).  We must reverse a conviction
"on the grounds of evidentiary insufficiency where an equal or
nearly equal theory of guilt[] and a theory of innocence is
supported by the evidence viewed in the light most favorable to the
verdict." Id. at 57 (citing United States v. Guerrero, 114 F.3d
332, 344 (1st Cir. 1997))(internal citations omitted).
B. Misapplication
    Courts have struggled to give precise definition to the
crime of misapplication, consistently noting that "[t]he problem
that has confronted and perplexed the courts is that there is no
statutory definition or common law heritage that gives content to
the phrase 'willfully misapplies.'" United States v. Wester, 90
F.3d 592, 595 (1st Cir. 1996). These uncertain origins have posed
a challenge to courts attempting to distinguish bad judgment from
bad conduct that is illegal. Nevertheless, in Wester, we recently
discussed the two notions that underlie the crime of
misapplication:  one relating to conduct, i.e., wrongful use of
bank funds, the other focusing on an intent to injure or defraud a
bank. The government cannot prove its claim of misapplication
without establishing both elements. See id. The interrelationship
between these elements is subtle, given that "the same facts can
easily be the basis for deeming the conduct to be wrongful and the
intent fraudulent." Id.   
                   Counts Two through Five  
    In this case, the government's theory was that Blasini
was attempting to deceive the bank as to the true purposes of the
loans: namely, that the disbursements to the Usera family were
partial payments of Coln's debt.  However, Coln's obligation to
the Usera family did not come due until April 14, 1988. Blasini
approved loans to Monserrate Usera and Ana Usera in August of 1987;
to Carmen Maduro in January of 1988; and to Vincete Usera Tous in
March of 1988.  Because Coln had no current obligation to the
Useras at the time these four loans were extended, the loans cannot
be characterized as partial payments of a debt.  Both Ana Usera and
Monserrate Usera testified that they needed money and, since the
balance on the farm would not come due for many months, they went
to Coln to seek an advance of funds.  Although the jury could have
concluded from this testimony that they were initially requesting
an advance of the money Coln owed them, both sisters testified
that they understood they were executing and signing loan
documents. Ana Usera testified that, following her discussions with
her sister and Coln, she decided to take out a loan from the bank.  
Monserrate Usera explained that she understood her obligation to
the bank and she noted that, even if Coln had not paid the balance
of his debt, she would have paid the balance of the loan.  Although
we have no direct testimony concerning Carmen Usera's loan, her
daughter Ana testified that her mother was also interested in
obtaining a loan to satisfy some of her debts. The government's
theory that Blasini was executing "sham" loans and intending to
defraud the bank as to their true purpose is simply not supported
by the evidence.  
    With regard to Vincente Usera, the government's theory of
misapplication is even weaker.  Coln had no outstanding obligation
to Vincente Usera, who was simply owed a commission following the
sale of the property. He was not entitled to a share of the
profits. There was no debt that Coln had to pay at any time.
    Nor are there "other circumstances" sufficient to convert
these loans into misapplication of bank funds. See United States v.
Gens, 493 F.2d 216, 222 (1st Cir. 1974)(holding that "where the
named debtor is both financially capable and fully understands that
it is his responsibility to repay, a loan to him cannot   absent
other circumstances   properly be characterized as a sham or
dummy"). The loan applications lacked financial statements and
credit histories yet they comported with minimal requirements for
legitimate loans. The former Ponce Bank commercial credit officer
testified that she could not think of any bank policy which would
forbid the bank to disburse a loan without any financial statement.  
Similarly, she testified that the lack of a credit history did not
mean that a loan could not be authorized.  The stated purpose on
the loans was accurate and Blasini was well within his authority to
approve the loans.  The four members of the Usera family signed
promissory notes and partial assignments for the loans.  Although
the partial assignments of Coln's obligations to the Useras were
not included in all of the loan applications, collateral was not
required for these loans and thus the partial assignments were not
prerequisites to their authorization. At trial the government
suggested that the failure to include the partial assignments in
the files was an attempt to withhold the fact that Coln's future
obligation was the means of intended repayment for the parties.
This omission, without more, is not enough to transform the
transactions into willful misapplication of bank funds.
    We do not mean to suggest that Coln and Blasini were not
playing it close to the line. Blasini may have been helping Coln
to curry favor with the Usera family so that they would be lenient
with Coln in the event that Coln had trouble satisfying his
obligations. This possibility, however, given the totality of the
circumstances, does not rise to the level of willful
misapplication.
                          Count Six
    The loan to Consuelo Garcia-Gomez stands in stark
contrast to the other four loans. Coln's debt to the Usera family
had matured and he was late with payment. Consuelo Garcia-Gomez
went to the bank and demanded payment.  She did not request a loan.
At the bank she initially met with Coln's brother who informed her
that the money was not available. She demanded that he pay her
something and she suggested $100,000. Thereafter, Blasini took
Consuelo Garcia-Gomez to meet with the loan officer and instructed
the officer on the details of the loan application.  On the actual
application, Blasini included the notation, "discussed and agreed
to by attorney R.C. Coln." Although there is some uncertainty in
the evidence as to how Consuelo Garcia-Gomez was brought to
Blasini's attention, the jury could have reasonably concluded,
given Blasini's notation on the application, that Coln himself
contacted Blasini and requested that Blasini facilitate a $100,000
loan from the bank to Consuelo Garcia-Gomez.   
    In cross-examination of Consuelo Garcia-Gomez, Blasini
attempted to show that she knew she was taking out a loan from the
bank. Consuelo Garcia-Gomez denied this knowledge, maintaining that
she did not pay any attention to what she was signing, even though
she signed and notarized all the pertinent documentation for a
$100,000 loan. She was simply happy that she was getting at least
half of what was owed to her.  Morever, there was evidence,
discussed infra, from which the jury could conclude that Blasini
misrepresented the purpose of the loan in the application (stating
that the loan was for the purchase of an apartment). As a result of
this deceptive conduct, Blasini caused the bank to part with its
monies through a sham loan to pay a portion of Coln's delinquent
debt.  This wrongful use of bank money, carried out with an intent
to deceive the bank about the true nature of the transaction,
involved all of the essential elements of the crime of
misapplication.  
C. Bank Fraud
     The Government charged Blasini with one count of bank
fraud, the elements of which are well established: 1) the defendant
must engage in a scheme or artifice to defraud, or must make false
statements or misrepresentations to obtain money from 2) a
financial institution and 3) must do so knowingly. See United
States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994).  A scheme or
artifice is defined to include "any plan, pattern or course of
action, including false and fraudulent pretenses and
misrepresentations intended to deceive others in order to obtain
something of value." Id.  (emphasis added)(quoting United States v.
Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)). The statute provides
that each execution of a scheme to defraud will constitute a
separate indictable offense.  See 18 U.S.C.  1344; see alsoBrandon, 17 F.3d at 422.  We have explained that "each time an
identifiable sum of money is obtained by a specific fraudulent
transfer, there is likely to be a separate execution of a scheme to
defraud." Id.  The government need not prove actual loss as a
result of the scheme, however. See United States v. Goldblatt, 813
F.2d 619, 624 (3d Cir. 1987)("The Government was not required to
show that [the bank] incurred a loss in order to prove a scheme to
defraud . . . ."); see also Brandon, 17 F.3d at 427. Nor must the
government show that the defendant personally benefitted from the
alleged scheme. See Goldblatt, 813 F.2d at 624.  
    In the indictment, the government charged Blasini with
one count of bank fraud based on five separate loan transactions,
each of which could have served as the basis for the fraud
allegation. See Brandon, 17 F.3d at 422. Thus, the bank fraud
conviction is unaffected by our finding that four of the loans were
legitimate.  With respect to the fifth transaction, the evidence
was sufficient for the jury to conclude that Blasini's conduct
satisfied the elements of bank fraud because he knowingly engaged
in a scheme to obtain bank funds, deceitfully characterized as a
loan, to satisfy $100,000 of Coln's outstanding obligation to
Consuelo Garcia-Gomez. Proof of Blasini's intent to deceive, a
necessary element of the misapplication charge, was also proof of
his scheme to obtain money from the bank by false representation,
a necessary element of the charge of bank fraud.  Accordingly, the
evidence establishing misapplication of bank funds on the fifth
loan also supports a conviction on the charge of bank fraud.  
D. False Entry
    We have not had an occasion to construe  1006.   Read
literally,  1006 provides that any employee of an insured bank who
makes a false entry in any statement to such institution with the
intent to defraud such institution is subject to federal penalty.
See 18 U.S.C.  1006.  In interpreting this section, however, the
Fifth Circuit has read a "materiality" requirement into the
provision: that is, the government must show that the defendant
knowingly and willfully made or caused to be made a false entry
concerning a material fact in any statement to the institution.
See United States v. Parks, 68 F.3d 860, 865 (5th Cir. 1995). ButCf. United States v. Harvard, 103 F.3d 412, 417-20 (5th Cir.
1997)(finding that materiality is not an element of 18 U.S.C.  
1005, a nearly identical statute).  In his argument, Blasini adopts
the Fifth Circuit's approach and contends that materiality is an
element of the crime. The government also reads  1006 to include
materiality as an element of the crime.  
    Despite the shared views of the parties that materiality
is an element of the statute, we can find no other circuit court
which has directly addressed this question. Recently, in United
States v. Wells, 519 U.S. 482, 117 S. Ct. 921 (1997), the Supreme
Court indicated its intent to construe similar statutory
definitions narrowly.  There the Court concluded that materiality
of the falsehood was not an element of knowingly making a false
statement to a federally insured bank under 18 U.S.C.  1014:
"Nowhere does it further say that a material fact must be the
subject of the false statement or so much as mention materiality.
. . . Thus, under the first criterion in the interpretive
hierarchy, a natural reading of the full text, materiality would
not be an element of  1014." Wells, 117 S. Ct. at 927(internal
citations omitted). The Court went on to conclude that the common
law would not import a materiality requirement into the term "false
statement" and that ultimately the "statutory history confirm[ed]
the natural reading." Id. at 928.  
    In light of this recent pronouncement of the Supreme
Court about a comparable statutory provision, the absence of
advocacy in this case on the inclusion of a materiality element in  
1006, and our own conclusion that the evidence was sufficient to
allow the jury to conclude 1) that the entry in question was false
and 2) that it was material, we assume without deciding that
materiality is an element of the crime of false entry for the
purposes of this appeal.
    Marisel Marrero, an assistant manager of the bank at the
time in question, testified that Blasini instructed her to prepare
documentation for a loan to Consuelo Garcia-Gomez. She testified
that Blasini provided her with the basic information for the
application and instructed her that the purpose of Consuelo Garcia-
Gomez's loan was the purchase of an apartment. Given Consuelo
Garcia-Gomez's testimony that she did not believe she was taking
out a loan, and given her brother's testimony that she was not
intending to purchase an apartment, it was reasonable for the jury
to conclude that the statement on the loan application about the
purchase of an apartment was false and that Blasini knew it to be
so.
    Materiality requires proof that the entry would have the
capability or tendency to influence the bank in its decision-making
process, or impair or pervert the functioning of the government
institution. See United States v. Parks, 68 F.3d 860, 865 (5th Cir.
1995); see also United States v. Corsino, 812 F.2d 26, 30 (1st Cir.
1987)(discussing the materiality requirement in 18 U.S.C.  1001).
"[T]he standard is not whether there was actual influence, but
whether it would have a tendency to influence." United States v.
Edgar, 82 F.3d 499, 510 (1st Cir. 1996). Thus, the government is
required to demonstrate the false entry's potential effect on the
governmental agency, even if the false entry did not actually
affect the government function. See United States v. Swaim, 757
F.2d 1530, 1534 (5th Cir. 1985)( the government need not show
actual reliance on the false statement, only that the statement
itself would have impacted the bank).
    Ironically, it was Blasini's own expert witness who
offered the testimony from which the jury could reasonably have
concluded that the false entry as to the purpose of the loan would
have the tendency to influence the bank's decision or,
alternatively, would affect a bank examiner's later review of the
propriety of the loan.  Michael Cinkala, a bank examiner with over
twenty years experience, testified that "the information you would
be looking for in a loan file would be, for instance, the financial
statement of an individual or corporation, the collateral, the   
any comments written as to the character of the individual, the
purpose of the loan, [and] some ability to repay the loan." From
this testimony, the jury could conclude that the stated purpose on
the loan application would be the type of information relied upon
by bank examiners in reviewing loans to determine whether the bank
is adhering to proper procedures.  Accordingly, we find that the
jury was presented with sufficient evidence from which it could
conclude that the entry on the loan application was false and
material in violation of  1006.
    Blasini further contends that the court's failure to
define "materiality" in its instructions to the jury was reversible
error. Blasini did not raise this objection to the instruction at
trial and our review is for plain error. See United States v.
Santana-Rosa, 132 F.3d 860, 863 (1st Cir. 1998). "[E]rror rises to
this level only when it is so 'shocking that [it] seriously
affect[ed] the fundamental fairness and basic integrity of the
proceedings conducted below.'" United States v. Ortiz, 23 F.3d 21,
25 (1st Cir. 1994)(citation omitted). We "review the context of the
charge as a whole to determine if it contains an error that
threatens to undermine the fundamental fairness of the trial."
Santana-Rosa, 132 F.3d at 863 (internal quotation marks omitted).
    Again, assuming that materiality is an element of the
crime, the court's failure to define "materiality" in its
instructions to the jury on the charge of false entry does not
constitute plain error. The issue of materiality was submitted to
the jury, with instructions that the false entry must be material
and that materiality was an essential element of the crime.  
Blasini did not offer an objection to the instruction at trial and
makes no developed argument on appeal why failure to define
material would constitute plain error.  We conclude that
"materiality" is not such a technical concept outside of the
jurors' experience that failure to define it rises to the level of
plain error. Cf. United States v. Fulmer, 108 F.3d 1486, 1495 (1st
Cir. 1997)(meaning of the word "intimidate" not outside a juror's
understanding such that failure to define the word would be an
error that threatened to undermine the fundamental fairness of the
trial).
E. Conspiracy  
    To convict Blasini on a charge of conspiracy, the
government was required to establish that: a conspiracy existed;
Blasini knew of and voluntarily participated in the conspiracy; and
an overt act took place in furtherance of the conspiracy.  SeeUnited States v. Woodward, 149 F.3d 46, 67 (1st Cir. 1998). The
agreement can be tacit rather than express. See id. Neither the
agreement nor Blasini's participation in furtherance of the
agreement need be proved by direct evidence. See id. at 68.
    We reject Blasini's contention that there was
insufficient evidence to support the conspiracy conviction.  As
discussed above, there was sufficient evidence from which the jury
could conclude that Blasini engaged in misapplication of bank
funds, bank fraud and making a false entry on a loan application --
the three substantive counts underlying the conspiracy count. There
was direct evidence of Blasini's conspiracy with Coln to use bank
funds to satisfy Coln's outstanding debt: Consuelo Garcia-Gomez's
application includes a handwritten notation by Blasini stating that
the loan was "discussed and agreed to by attorney R.C. Colon."  
Moreover, there was circumstantial evidence from which the jury
could infer that Blasini agreed to assist Coln in satisfying his
debt to Consuelo Garcia-Gomez with bank funds, and that he
knowingly participated in the execution of the plan to use bank
funds for this purpose.
    Finally, Blasini contends that the use of a general
verdict form invalidates his conviction on the conspiracy count
because the jury acquitted him on Count Nine, one of the overt acts
charged in furtherance of the conspiracy.  He claims that "the use
of a general verdict form does not reveal which objects or overt
acts the jury relied on to find Appellant guilty of conspiracy."   
This argument is against the force of the law and was rejected in
Griffin v. United States, 502 U.S. 46, (1991), where the Supreme
Court stated: "When a jury returns a verdict on an indictment
charging several acts in the conjunctive . . . the verdict stands
if the evidence is sufficient with respect to any one of the acts
charged." Id. at 55-56 (quoting Turner v. United States, 396 U.S.
398, 420 (1970)); see also United States v. Mitchell, 85 F.3d 800,
810-811 (1st Cir. 1996)(discussing application of Griffin). The use
of a general verdict form does not invalidate the verdict on Count
One. See United States v. Fisher, 22 F.3d 574, 576 (5th Cir.
1994)(holding that in light of Griffin, there is no error in the
use of a general verdict form for a conspiracy count).   
III. Sentencing
    In light of the convictions that must be vacated, we must
also vacate the sentence.  We do so without analyzing the alleged
errors in sentencing. On remand, the sentencing court will have the
full opportunity to re-evaluate and recalculate Blasini's sentence
in light of our rulings. See United States v. Pimienta-Redondo, 874
F.2d 9, 14 (1st Cir. 1989)("When the conviction on one or more of
the component counts is vacated, common sense dictates that the
judge should be free to review the efficacy of what remains in
light of the original plan, and to reconstruct the sentencing
architecture upon remand, within applicable constitutional and
statutory limits if that appears necessary in order to ensure that
the punishment still fits both crime and criminal.").
    The judgment is VACATED on Counts Two through Five,
AFFIRMED on Counts One, Six, Seven and Eight, and REMANDED for re-
sentencing.  Upon remand, the district court shall enter a judgment
of acquittal on Counts Two through Five.

</body>

</html>